[913 NE2d 387, 885 NYS2d 1]

In the Matter of FAITH ANN PEASLEE and Others.

GEORGE M. REIBER, Appellant, v GMAC, LLC, et al., Respondents.

Argued June 2, 2009; decided June 24, 2009

**POINTS OF COUNSEL**

*Law Office of George M. Reiber,* Rochester (*George M. Reiber* of counsel), for appellant, and *George M. Reiber,* appellant pro se. I. Negative equity is not part of the obligation incurred to acquire collateral under UCC 9-103 (a) (2). II. Negative equity represents an obligation which existed before the collateral was obtained. It is a separate debt which, whether secured or unsecured under the prior transaction, is certainly an unsecured debt from the prior transaction which is being included in the current transaction. It is not a similar obligation that a seller would incur. (*In re Graupner,* 537 F3d 1295.) III. If the District Court's decision is allowed to stand, then there is no limit to what antecedent debt may be included for payment under its expanded definition of purchase-money security interest. IV. Value must be used to acquire the collateral which is the subject of the new lien. The check that is written to the lienholder on the trade-in vehicle is not value in fact so used to purchase the subject collateral. V. The Motor Vehicle Retail Instalment Sales Act cannot be used to interpret the Uniform Commercial Code. (*Matter of Dutchess County Dept. of Social Servs. v Day,* 96 NY2d 149; *Becker v Huss Co.,* 43 NY2d 527; *H. Kauffman & Sons Saddlery Co. v Miller,* 298 NY 38; *Bluebird Partners v First Fid. Bank,* 97 NY2d 456; *Matter of Plato's Cave Corp. v State Liq. Auth.,* 68 NY2d 791; *Meegan v Progressive Ins. Co.,* 43 AD3d 182.)

*Stinson Morrison Hecker LLP* (*Barkley Clark* and *Katherine M. Sutcliffe Becker,* of the District of Columbia bar, admitted pro hac vice of counsel), and *Peter N. Cubita,* New York City, for

GMAC LLC and another, respondents. I. The Uniform Commercial Code definition of a "purchase-money obligation" includes the net negative equity obligation financed under a motor vehicle retail instalment sale contract. (*Fidelity & Deposit Co. of Md. v Chemical Bank N.Y. Trust Co.*, 62 Misc 2d 509, 65 Misc 2d 619; *In re Yale Express Sys., Inc.*, 370 F2d 433; *United States v Ron Pair Enterprises, Inc.*, 489 US 235; *In re Graupner*, 537 F3d 1295; *C. Bean Lbr. Transp., Inc. v United States of Am.*, 68 F Supp 2d 1055; *In re Freeman*, 956 F2d 252; *General Elec. Capital Commercial Auto. Fin. v Spartan Motors*, 246 AD2d 41; *National Cash Register Co. v Mishkin's 125th St.*, 65 Misc 2d 386; *General Motors Acceptance Corp. v Stotsky*, 60 Misc 2d 451.) II. The Motor Vehicle Retail Instalment Sales Act is not principally a financial disclosure statute. (*In re Graupner*, 537 F3d 1295; *Matter of Plato's Cave Corp. v State Liq. Auth.*, 68 NY2d 791.) III. Pandora's box is firmly locked by the Uniform Commercial Code "close nexus" test and the Motor Vehicle Retail Instalment Sales Act restriction on amounts that may be financed in connection with motor vehicle retail instalment sales. IV. The Federal Truth in Lending Act precludes "manipulation" by regulating the disclosure of negative equity financed under a retail instalment sale contract. V. If the Court concludes that the net negative equity obligation is not a "purchase-money obligation," the dual status rule should be applied to the purchase-money portion of the obligation. (*Pristas v Landaus of Plymouth, Inc.*, 742 F2d 797; *National Cash Register Co. v Mishkin's 125th St.*, 65 Misc 2d 386; *In re Freeman*, 956 F2d 252.) VI. The trustee's remaining arguments, which are unsupportable and/or fanciful, cannot withstand minimal scrutiny. (*Bucyrus-Erie Co. v Casey*, 61 F2d 473.)

*Law Offices of David B. Shaev*, New York City (*David B. Shaev* of counsel), for Ingrid M. Hillinger and others, amici curiae. I. The price of collateral is relevant only when determining a debtor's purchase-money obligation to a seller: value given to enable the acquisition of rights in collateral applies when determining a debtor's purchase-money obligation to a lender. II. Negative equity is antecedent debt. III. UCC 9-103's "purchase-money obligation" does not include antecedent debt and, therefore, does not include negative equity. IV. According to the case law, "purchase-money obligation" does not include antecedent debt. (*In re Harper*, 516 F3d 1180.) V. UCC 9-103, Comment 3's reference to obligations for expenses incurred in acquiring rights in the collateral including sales taxes, duties, finance charges "and other similar obligations" does not include

obligations incurred to satisfy antecedent debt. (*Bucyrus-Erie Co. v Casey,* 61 F2d 473; *In re Halferty,* 136 F2d 640.) VI. The pre-Uniform Commercial Code purchase-money concept did not include antecedent debt. (*United States v New Orleans R. Co.,* 12 Wall [79 US] 362; *Venner v Farmers' Loan & Trust Co. of N.Y.,* 90 F 348; *Westinghouse Elec. & Mfg. Co. v Brooklyn R.T. Co.,* 276 F 152; *Harris v Youngstown Bridge Co.,* 90 F 322.) VII. The doctrine of in pari materia does not require reading the New York Motor Vehicle Retail Instalment Sales Act and the Uniform Commercial Code together. (*Brooks v Avery,* 4 NY 225; *Morris Plan Indus. Bank of Schenectady v Faulds,* 269 App Div 238; *Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.,* 66 NY2d 298; *81 Franklin Co. v Ginaccini,* 149 Misc 2d 124.) VIII. Interpreting "purchase-money obligation" to include antecedent debt would alter its well-established meaning and upset carefully calibrated federal and state loss allocation principles based on that well-established meaning.

## OPINION OF THE COURT

PIGOTT, J.

The United States Court of Appeals for the Second Circuit, by certified question, asks us to decide whether "the portion of an automobile retail instalment sale attributable to a trade-in vehicle's 'negative equity' [is] a part of the 'purchase-money obligation' arising from the purchase of a new car, as defined under New York's U.C.C.?" (547 F3d 177, 186 [2d Cir 2008].) We find that it is.

### I.

On August 28, 2004, Faith Ann Peaslee entered into a retail instalment contract for the purchase of a 2004 Pontiac Grand Am.[1] As part of the transaction, Peaslee traded in her vehicle, which had a negative trade-in value, or negative equity, of $5,980.[2] That amount was rolled into the financing of her new car along with other charges, resulting in financing totaling $23,180. The lien against the trade-in was paid off by the dealer, and the dealer's security interest in the new vehicle was assigned to GMAC, LLC.

Nearly two years after purchasing her new vehicle, Peaslee filed for chapter 13 bankruptcy and a trustee was appointed to

---

1. Although this lawsuit involves five different debtors, the Second Circuit chose to relate the facts pertaining to only one debtor—Peaslee—as representative of each of the cases. We do the same.

2. In automobile industry parlance, "negative equity" occurs when the trade-in vehicle is subject to a lien that exceeds the vehicle's value.

handle the estate. As part of her bankruptcy plan, Peaslee proposed that she retain possession of the vehicle and that, pursuant to United States Bankruptcy Code (11 USC) § 506 (a) (1),[3] GMAC's secured claim would be reduced to $10,950, representing the alleged retail value of the vehicle. Under Peaslee's proposal, the remaining amount owed to GMAC, $6,954.95, would be treated as an unsecured claim.

GMAC objected to this characterization of its claim and argued that, pursuant to the "hanging paragraph" set forth in Bankruptcy Code § 1325 (a), it was entitled to have the entire $17,904.95 treated as a secured claim. The "hanging paragraph," which was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, states, in pertinent part, that

> "[f]or purposes of paragraph (5), [Bankruptcy Code] section 506 shall not apply to a claim described in that paragraph *if the creditor has a purchase money security interest securing the debt that is the subject of the claim,* the debt was incurred within the 910-day [*sic*] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor" (emphasis supplied).

The trustee moved to have the Bankruptcy Court determine that GMAC had a secured claim of $10,950 and only an unsecured claim for the balance. The Bankruptcy Court did just that, and held that the term "purchase money security interest" (PMSI), as set forth in New York's Uniform Commercial Code, did not include negative equity (358 BR 545, 558 [WD NY 2006]). The United States District Court for the Western District of New York reached the opposite conclusion (373 BR 252, 258-261 [WD NY 2007]). The Second Circuit, noting that Congress failed to provide a definition of purchase-money security interest either in the hanging paragraph or elsewhere, concluded "that state law governs the definition of PMSI in the hanging

---

3. This provision states, in pertinent part, that
"[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."

paragraph" and certified to us the question of whether the New York Uniform Commercial Code considers that portion of a retail instalment sale attributable to the negative equity of a trade-in vehicle to be part of the purchase-money obligation arising from the sale of a new car (547 F3d 177, 184, 186 [2008]).

For the reasons that follow, we answer the question in the affirmative.

## II.

"A security interest in goods is a purchase-money security interest . . . to the extent that the goods are purchase-money collateral with respect to that security interest" (UCC 9-103 [b] [1]). Purchase-money collateral is defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral" (UCC 9-103 [a] [1]). A purchase-money obligation is "an obligation of an obligor incurred as all or part of the *price* of the collateral *or* for *value given* to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" (UCC 9-103 [a] [2] [emphasis supplied]). The UCC therefore establishes two ways that a purchase-money obligation may arise: (1) where the obligor—the debtor—incurs an obligation as all or part of the "price" of the collateral, or (2) where "value" is given to enable the debtor to acquire the collateral. We conclude that the "negative equity" here fits within either definition.

## III.

Addressing "price" first, although that term is not defined by New York's UCC, the expansive examples given in an official comment concerning what items constitute the "price of the collateral" indicate that the term "price" should be afforded a broad interpretation. Specifically, with respect to a purchase-money obligation,

> " '*price*' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and *other similar obligations*" (UCC 9-103, Comment 3 [emphasis supplied]).

The list of examples in Comment 3 that clarify "price" is representative, not exhaustive, and cannot be read to limit those "other similar obligations" to the 10 items preceding that term, all of which are clearly either transaction costs and/or components of price. Indeed, the phrase "and other similar obligations" intimates that "price" under New York's UCC is broad enough to encompass negative equity financing. For instance, just as "finance charges" and "interest" constitute obligations that are paid over and above the vehicle's actual cost (such charges being incurred as part of the overall financing of the vehicle), negative equity is likewise part of the overall price of a new vehicle. Moreover, negative equity constitutes an obligation that fits comfortably within the "other similar obligations" language in Comment 3, particularly in regard to automobile sales because the negative equity from the trade-in is often "rolled in" as part of the overall price of the newer vehicle to facilitate the transaction. It follows, then, that under New York's UCC negative equity constitutes "an obligation . . . incurred as all or part of the price of the collateral."

This broad interpretation of the term "price" to include negative equity furthers New York's policy that the UCC "be liberally construed and applied to promote its underlying purposes and policies," including "the continued expansion of commercial practices through custom, usage and agreement of the parties" (UCC 1-102 [1], [2] [b]). After all, the parties to the instant transaction agreed that the negative equity from the older vehicle would be "rolled-in" as part of the purchase price of the newer vehicle, not an uncommon practice in the realm of automobile sales (see In re Graupner, 537 F3d 1295, 1303 [11th Cir 2008]), thereby furthering the policy of facilitating commercial transactions. Indeed, to exclude negative equity as part of the "price" would serve to hinder commercial practices rather than facilitate them.

Additionally, and not inconsequentially, New York has defined "price" in its Motor Vehicle Retail Instalment Sales Act (MVRISA) to include negative equity (see Personal Property Law § 301 [6]). Under the MVRISA, "cash sale price" can "include the unpaid balance of any amount financed under an outstanding motor vehicle loan agreement or motor vehicle retail instalment contract or the unpaid portion of the early termination obligation under an outstanding motor vehicle retail lease agreement" (id.).

## IV.

Turning to "value given," we likewise disagree with the trustee's contention that negative equity is not related to the acquisition of collateral because it is merely a payoff of an antecedent debt such that it cannot be deemed "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" (UCC 9-103 [a] [2]).

By paying off the outstanding debt on the trade-in, a lender is giving "value" to the debtor in order to allow, or "enable," the debtor to purchase, or "acquire rights in," the vehicle (*see In re Price*, 562 F3d 618, 625 [4th Cir 2009]). When a lender finances the purchase of a new vehicle and a portion of that financing pays off the negative equity owed on the trade-in (i.e., "the value is in fact so used" [UCC 9-103 (a) (2)]), that loan constitutes a purchase-money obligation of the buyer, the purchased vehicle constitutes purchase-money collateral, and the security interest obtained by the lender is a PMSI.

## V.

Finally, Comment 3 instructs that the existence of a PMSI also "requires a close nexus between the acquisition of collateral and the secured obligation" (UCC 9-103, Comment 3); and that requirement has plainly been met here. Without a payoff of the trade-in debt, the buyer will generally not be able to consummate the purchase of the newer car, and the financing of the negative equity is thus integral to the completion of the sale (*see generally Graupner*, 537 F3d at 1302).

Here, Peaslee's debt to GMAC was incurred at the time of the trade-in, under the same retail instalment contract and for the same purpose of purchasing the Grand Am. Simply put, the financing of the negative equity was "inextricably linked to the financing of the new car" (*In re Petrocci*, 370 BR 489, 499 [ND NY 2007]), thereby satisfying the "close nexus" requirement under the New York UCC.

Accordingly, the certified question should be answered in the affirmative.

SMITH, J. (dissenting). The majority interprets the term "purchase-money security interest" (PMSI) in the Uniform Commercial Code (UCC) without considering what a PMSI is or why it exists. When the nature and purpose of a PMSI are understood, I think it becomes apparent that the majority's interpretation is wrong.

I

Before turning to the nature and function of a PMSI, I will discuss the language of UCC 9-103 and of Comment 3 accompanying it—considering this language, as the majority does, essentially in a vacuum. Even from that viewpoint, I do not find the majority's interpretation convincing.

As the majority explains, the UCC definitions of a PMSI, "purchase-money collateral" and "purchase-money obligation" interlock (*see* majority op at 80). The critical definition is of "purchase-money obligation": "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" (UCC 9-103 [a] [2]). The question the Second Circuit has asked us is, in substance, whether "price" or the more cumbersome term "value given to enable the debtor to acquire" includes the obligation of an automobile purchaser to a seller, or money borrowed by such a purchaser from a lender, when that seller or lender, in connection with the purchase of a new car, refinances the purchaser's "negative equity"—i.e., the amount the purchaser owes on her old car in excess of the old car's value. "Price" and "value given to enable" are not defined in the statute but are explained in Comment 3 to UCC 9-103:

> "As used in subsection (a) (2), the definition of 'purchase-money obligation,' the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations."

Simply from reading this language, I find it a stretch to say that an obligation for refinanced negative equity is among the "expenses incurred in connection with acquiring" a new car. A refinanced loan is not, in accounting terms, properly speaking, an "expense" at all; it is the substitution of a new liability for an old one. The majority finds that negative refinancing is included in the catchall phrase "other similar obligations." But the items listed in the comment are essentially transaction costs (*see In re Mitchell*, 379 BR 131, 137 n 8 [Bankr, MD Tenn 2007]), and refinanced negative equity is not "similar" to them; it will

typically be larger, and more readily separable from the purchase transaction itself, than such things as sales taxes, duties and finance charges.

Still, I am willing to concede that the terms "price" and "value given" in UCC 9-103 (a) (2), as explained by Comment 3, are ambiguous if read without reference to the purpose for which that statute was enacted. When that purpose is considered, however, the ambiguity disappears.

## II

The reason why a PMSI is defined in article 9 of the UCC is that certain sections of that article "provide special priority rules for purchase-money security interests" (UCC 9-103, Comment 2). Most important, under UCC 9-324 (a), a PMSI has, with certain exceptions, "priority over a conflicting security interest in the same goods." This means that someone who sells goods on credit, or lends money to finance their purchase, can get a lien on the goods that is superior to the lien of a previous lender, even if that lender has a perfected security interest in all of the buyer's property, whenever acquired. The general idea is that someone who provides the credit that makes possible the purchase of goods should have the first claim to them. As the Bankruptcy Appellate Panel of the Ninth Circuit has explained:

> "Holders of PMSIs in goods or software can obtain priority over a prior-filed lien; this is an exception to the general 'first in time is first in priority' structure used by the UCC. UCC § 9-324. This exception has generally been justified on equitable notions: it protects vendors of goods from after-acquired property clauses generally used by banks and financiers. *See* [2 GRANT] GILMORE [Security Interests in Personal Property § 28.1], at 779 ('What might be called the "Don't be a Pig" school of advice to Article 9 lenders has a fashionable currency and may be expected to have some influence on lending patterns.'); James J. White, *Reforming Article 9 in Light of Old Ignorance and the New Filing Rules*, 79 MINN. L.REV. 529, 562 (1995) ('[T]he most persuasive claim for purchase money priority is the fairness argument—that reasonable businesspeople expect to have priority when they sell goods from their own stock.')" (*In re Penrod*, 392 BR 835,

845-846 [BAP 9th Cir 2008]; *see also* Gilmore, *The Purchase Money Priority*, 76 Harv L Rev 1333 [1963].)

Thus, the Second Circuit's question—whether a "purchase-money obligation" (i.e., an obligation secured by a PMSI) includes "the portion of an automobile retail instalment sale attributable to a trade-in vehicle's 'negative equity' "—may be rephrased in this way: "Is a lien resulting from the refinancing of a trade-in vehicle's 'negative equity' entitled to the special priority given PMSIs over other liens by UCC article 9?" When the question is asked that way, I do not see how the answer can be yes. The whole idea of a PMSI is that a seller or lender who finances the purchase of goods has a unique interest, superior to the interest of other lenders, in the goods thus purchased. I can imagine no reason to enlarge the priority lien of that seller or lender because, as part of the same transaction, it refinances the debt remaining from another purchase that took place years ago. As an Appellate Division case interpreting UCC article 9 recognizes, "a loan procured to satisfy a pre-existing debt" is inconsistent with the basic idea of a PMSI, which secures "an advance 'enabl[ing] the debtor to acquire rights in . . . the . . . collateral' (UCC 9-107 [b])" (*General Elec. Capital Commercial Automotive Fin. v Spartan Motors*, 246 AD2d 41, 50 [2d Dept 1998] [brackets and ellipses in original]).

Seen in this light, the question the Second Circuit has asked us must be answered no.

## III

It may well be that the answer the majority gives to the Second Circuit's question, though wrong as a matter of state law, will produce a just result in this case—or, at least, a result more consistent with Congress's purpose in enacting the "hanging paragraph" as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). The purpose of the hanging paragraph, as I understand it, is to protect sellers and other financiers of automobile purchases against buyers who go bankrupt shortly after buying cars, and then use the "cram down" provision of the Bankruptcy Code to keep the cars without paying all of the debt they incurred to purchase them. This abuse may well extend to transactions that include "negative equity," and I can understand the rationale for adopting an interpretation of the hanging paragraph that reaches such transactions.

But we have not been asked to interpret, and in this federal case have no power to interpret, the hanging paragraph or any other provision of federal law. The Second Circuit has already decided, as have many other federal courts, that the words "purchase money security interest" in the hanging paragraph must be interpreted according to state law—in other words, according to article 9 of the UCC, which was written long before BAPCPA or the hanging paragraph existed. I believe the majority may have overlooked this point, and adopted an interpretation better suited to the purposes of BAPCPA than to the purposes of the UCC.

If my surmise is correct, we are not the first court to suffer this confusion. In *In re Graupner* (537 F3d 1295, 1302 [11th Cir 2008]), a Federal Court of Appeals, interpreting the UCC as the majority here has, defended its interpretation as comporting "with what Congress intended in enacting BAPCPA." Even more recently, in *In re Price* (562 F3d 618, 628 [4th Cir 2009]), another Federal Court of Appeals defended the same result as coinciding "with Congress's intent in enacting the hanging paragraph." Neither court explained how Congress's intent in enacting BAPCPA could be relevant to the correct interpretation of the UCC.

But the apparent confusion of the *Graupner* and *Price* courts in interpreting the UCC is of less consequence than the majority's error today. Our interpretations of state law are binding precedents. If the scope given to a PMSI by the UCC becomes important in some future case involving the sort of issue the UCC was written to resolve—a priority dispute between creditors under state law—today's decision may present a significant problem. Perhaps a future court will solve the problem by limiting the majority's holding to the peculiar context that produced it. Until and unless that happens, today's decision will becloud the clarity and predictability that the authors of article 9 were seeking in enacting the statutes governing PMSIs.

Judges GRAFFEO, READ and JONES concur with Judge PIGOTT; Judge SMITH dissents and votes to answer the certified question in the negative in a separate opinion in which Chief Judge LIPP-MAN and Judge CIPARICK concur.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules

of Practice of the New York State Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.