MURPHY, Circuit Judge.
I. Introduction
Appellants John Wesley Ford, Sr. and Cynthia Ford appeal an order of the Bankruptcy Court for the District of Kansas rejecting their proposed Chapter 13 bankruptcy plan. The Fords have an outstanding debt to Appellee Ford Motor Credit Company (“Ford Motor Credit”) secured by their automobile. The debt includes the amount paid to discharge the “negative equity” on their trade-in vehicle. Negative equity is the amount owed on a loan in excess of the collateral’s value. In their proposed bankruptcy plan, the Fords sought to bifurcate their automobile debt to Ford Motor Credit under 11 U.S.C. § 506(a) into secured and unsecured claims. The unsecured claim would be the portion of the debt used to discharge the negative equity in the trade-in. Ford Motor Credit objected to the proposed plan, claiming the debt bifurcation was impermissible under the “hanging paragraph” of 11 U.S.C. § 1325(a). The bankruptcy court sustained the objection, and the Fords sought an immediate appeal to this court. We conclude we have jurisdiction to hear this appeal under 28 U.S.C. § 158(d)(2) and AFFIRM the ruling of the bankruptcy court.
II. Background
The underlying facts of this case are not in dispute. The Fords purchased a 2007 Ford F-150 truck from Rusty Eck Ford on February 24, 2007. The Fords made a down payment of $1500 and received $40,168.30 in financing secured by the truck. At the same time, the Fords traded in their 2006 Ford truck. The 2006 truck was valued at $16,300, but the Fords owed $23,500 on it. $11,693.30 in financing covered “[ajmounts paid on [the Fords’] behalf.” This included taxes, fees, a service contract, gap insurance, and $7200 to pay off the creditor on the 2006 truck for the amount owed on the vehicle in excess of its present value.
The Fords filed for Chapter 13 bankruptcy fewer than four months later. Under their proposed plan, they sought to reduce the secured debt on the 2007 truck by $7200, the amount of negative equity on their trade-in. That amount would be treated as an unsecured claim under the plan. Ford Motor Credit objected to the proposed treatment of its security interest.
Exercising jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(E), (L), the bankruptcy court concluded the negative equity financing was part of the creditor’s purchase money security interest under the “hanging paragraph” in 11 U.S.C. § 1325(a) and thus the debt could not be bifurcated and “crammed down” pursuant to 11 U.S.C. § 506(a). The bankruptcy court sustained Ford Motor Credit’s objection to the proposed plan and ordered the Fords to file an amended plan treating the entire Ford Motor Credit debt as secured debt.
Both parties certified that an immediate appeal to this court was proper pursuant to 28 U.S.C. § 158(d)(2)(A) because the appeal presents a question of law as to which there is no controlling decision of *1282 this court or the Supreme Court and the question requires resolution of conflicting bankruptcy court decisions. A panel of this court then authorized the appeal to proceed, which satisfied the jurisdictional requirements of 28 U.S.C. § 158(a)(3) and 28 U.S.C. § 158(d)(2)(A) for appeals to this court of interlocutory bankruptcy orders. See Fed. R. Bankr.P. 8003(d).[1]
III. Discussion
The bankruptcy court’s interpretation of the Bankruptcy Code is a question of law to be reviewed de novo. Hamilton v. Lanning (In re Lanning), 545 F.3d 1269, 1274 (10th Cir.2008). When consumers enter Chapter 13 bankruptcy, they are normally permitted, if they wish, to bifurcate each secured debt into two claims: (1) an amount equal to the present value of the collateral, and (2) any excess. 11 U.S.C. § 506(a)(1). The excess portion is converted into unsecured debt. Id. The plan can then be “crammed down,” or confirmed over the secured creditor’s objection, so long as the creditor receives a lien securing the claim and the plan provides for payments to the creditor over the life of the plan equal to the present value of the collateral. 11 U.S.C. § 1325(a)(5)(B); Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Whether debt is secured or unsecured is significant because secured creditors generally must be repaid in full before unsecured creditors receive anything. 11 U.S.C. § 1325(a)(5), (b)(1).
In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (“BAPCPA”). One provision of BAPCPA amended the Bankruptcy Code to remove certain secured consumer debts from bifurcation and cramdown. Pub.L. No. 109-8, § 306(b), 119 Stat. 23, 80 (2005). At the end of 11 U.S.C. § 1325(a), Congress added an unnumbered paragraph, now commonly known as the “hanging paragraph,” which reads, in relevant part, as follows:
For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor....
11 U.S.C. § 1325(a).
The hanging paragraph protects creditors possessing a “purchase money security interest securing the debt that is the subject of the claim” from § 506(a) bifurcation and cramdown. 11 U.S.C. § 1325(a). The parties agree the collateral in this case is a motor vehicle acquired for the personal use of the debtors and the motor vehicle was acquired within 910 days of the bankruptcy filing. The only issue in dispute is the extent to which Ford Motor Credit has a “purchase money security interest.”
The issue of whether, under the hanging paragraph, a creditor has a purchase money security interest in the negative equity on a trade-in vehicle has been litigated extensively throughout the country, and the rulings have not been consistent.[2] See *1283 Graupner v. Nuvell Credit Corp. (In re Graupner), 537 F.3d 1295, 1300 (llth Cir.2008) (collecting cases). The Tenth Circuit Bankruptcy Appellate Panel recently held creditors have a purchase money security interest in negative equity. AmeriCredit Fin. Servs., Inc. v. Padgett (In re Padgett), 408 B.R. 374, 381-82 (10th Cir. BAP 2009). District courts and bankruptcy courts within this circuit have reached varied results on the question. Compare, e.g., Citifinancial Auto v. Hernandez-Simpson, 369 B.R. 36, 48 (D.Kan.2007) (holding bifurcation and cramdown are available because purchase money security interest does not include negative equity), In re McCauley, 398 B.R. 41, 45-46 (Bankr.D.Colo.2008) (same), and In re Padgett, 389 B.R. 203, 211-12 (Bankr.D.Kan.2008) (same), rev’d sub nom., AmeriCredit Fin. Servs., Inc. v. Padgett (In re Padgett) 408 B.R. 374, 381-82 (10th Cir. BAP 2009), with In re Ford, 387 B.R. 827, 833 (Bankr.D.Kan.2008) (holding bifurcation and cramdown are unavailable because negative equity is part of purchase money security interest), and In re Austin, 381 B.R. 892, 897 (Bankr.D.Utah 2008) (same). Two circuit courts to date have ruled on the question, both holding the purchase money security interest held by a creditor includes the negative equity on the trade-in vehicle. In re Price, 562 F.3d 618, 628 (4th Cir.2009); In re Graupner, 537 F.3d at 1301. The Second Circuit declined to rule on the issue, instead certifying the question to the New York Court of Appeals. Reiber v. GMAC, LLC (In re Peaslee), 547 F.3d 177, 186 (2d Cir.2008). After certification the New York Court of Appeals concluded purchase money security interests include the negative equity. In re Peaslee, 13 N.Y.3d 75, 913 N.E.2d 387, 885 N.Y.S.2d 1, 2009 WL 1766000 (N.Y.2009). The issue previously came before this court, but the case was rendered moot before the court ruled on the merits. Wells Fargo Bank, NA v. Griffin (In re Hunt), 550 F.3d 1002, 1004 (10th Cir.2008).
The Bankruptcy Code does not define the term purchase money security interest. Property interests referred to in the Bankruptcy Code are generally defined by state law. Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). This court, therefore, has looked to state law for a definition of the term as it is used elsewhere in the Bankruptcy Code. Billings v. AVCO Colo. Indus. Bank (In re Billings), 838 F.2d 405, 406 (10th Cir.1988) (“[T]he courts have uniformly looked to the law of the state in which the security interest is created.”). When Congress enacts a statute using a phrase that has a settled judicial interpretation, it is presumed to be aware of the prior interpretation. Comm’r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). When Congress drafted BAPCPA in 2005, it chose to use the term “purchase money security interest” without defining it. Under settled case law, that term, when used in the Bankruptcy Code, is interpreted with reference to state law. As a consequence, we presume Congress intended that term as used in BAPCPA to be interpreted according to state law.
Kansas has adopted the relevant portion of Revised Article 9 of the Uniform Commercial Code (“U.C.C.”), and it also lists the Official U.C.C. Comment in its statutory compilation. Kan. Stat. Ann. § 84-9-103. Under Kansas law, “A security interest in goods is a purchase-money security interest: (1) To the extent that the goods are purchase-money collateral with respect to that security interest.... ” Id. § 84-9-103(b). Purchase-money collateral is defined as “goods or software that secures a purchase-money obligation incurred with respect to that collateral.” Id. § 84-9-103(a)(l). A purchase-money obligation is “an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the < value is in fact so *1284 used.” Id. § 84-9-103(a)(2). Whether something is a purchase-money security interest thus depends upon whether the underlying obligation was incurred to pay “all or part of the price of the collateral” or covers “value given to enable the debtor to acquire rights in or the use of the collateral.” Id. § 84-9-103(a).
The Official Comment to Kan. Stat. Ann. § 84-9-103 provides additional guidance on what constitutes a purchase-money security interest. It states:
[T]he “price” of collateral or the “value given to enable” includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney’s fees, and other similar obligations.
The concept of “purchase-money security interest” requires a close nexus between the acquisition of collateral and the secured obligation.
Id. § 84-9-103 cmt. 3.
The issue is whether paying off negative equity in a trade-in car is part of the “price” of the new car or part of the “value given to enable” acquisition of the new car.[3] The Fords point out that it is possible to acquire rights in a new car without paying off the negative equity in the old one. The debtor’s rights in the two vehicles are distinct. The Fords further argue the trade-in encompasses two separate transactions: the transfer of rights in the trade-in vehicle and the transfer of rights in the new vehicle. They claim negative equity is different than the expenses listed in the Official Comment. In opposition to this position, Ford Motor Credit emphasizes that vehicle trade-ins are commonplace. It further argues that many vehicle trade-ins involve negative equity on the old vehicle and cites a study by J.D. Power and Associates estimating that approximately thirty-eight percent of new car buyers have negative equity at trade-in. It argues the trade-in of the old vehicle is directly related to the purchase of the new vehicle, and the former would not have occurred absent the latter. The Kansas Bankers Association, as amicus curiae, argues the Fords’ position artificially breaks a single, package transaction into two parts.
The Fords’ position has some logic, and it is not surprising that a number of courts have adopted it. On balance, however, it is not as persuasive as the position advanced by Ford Motor Credit. It may be theoretically possible to split the exchange of vehicles into two separate transactions, but that is not how the parties treated the deal. They signed a single agreement encompassing the trade-in of the old vehicle *1285 and the sale of the new vehicle. This type of transaction, moreover, is very common in the automobile industry. The very name “trade-in” implies the two vehicle exchanges are linked. The entire exchange would undoubtedly be a single transaction if the Fords did not have negative equity on the trade-in vehicle and the two parties were simply swapping items of value. As indicated by the data cited by Ford Motor Credit, the existence of negative equity on the trade-in vehicle has not prevented consumers from continuing to trade-in old vehicles for new ones, and it should not turn the swap into two separate transactions. As the Bankruptcy Court recognized, discharging negative equity is necessary to complete the trade-in because otherwise the dealer would take the old vehicle subject to a lien exceeding the vehicle’s value. In re Ford, 387 B.R. at 831.
We conclude the trade-in exchange is essentially a single transaction. The expense incurred in retiring the lien on the trade-in vehicle, therefore, is an “ex-pensen incurred in connection with acquiring rights” in the new car. Kan. Stat. Ann. § 84-9-103 cmt. 3. There is also the requisite “close nexus” between the acquisition of the new vehicle and the secured obligation. Id. The entire debt incurred by the debtors is therefore a “purchase-money obligation,” the new vehicle is “purchase-money collateral” for the entire obligation, and the security interest in the entire debt is a purchase-money security interest under Kansas law. Id. § 84-9-103(a)-(b). Because Ford Motor Credit has a purchase-money security interest in the full amount of the debt, it is entitled to the protection of the hanging paragraph. 11 U.S.C. § 1325(a). The Bankruptcy Court was correct, therefore, in sustaining Ford Motor Credit’s objection to the proposed plan.
The Fords contend, as does the dissent, that the phrase “expenses incurred in connection with acquiring rights” must be interpreted in light of its proximity to the other examples listed in the Official Comment. This is undoubtedly true, but we discern no significant difference between the expense of discharging negative equity on a trade-in and some of the other examples listed in the Official Comment. The Official Comment lists “sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney’s fees, and other similar obligations” as expenses that can be part of a purchase-money security interest. Kan. Stat. Ann. § 84-9-103 cmt. 3 (emphasis added). Collection and enforcement expenses and attorney’s fees are costs incurred so that the creditor may realize the value of the security interest. The discharge of negative equity clears the title of the trade-in vehicle, permitting the creditor to realize the value of the vehicle it receives as part of the trade. Both categories of expenses allow the creditor to realize its benefit of the bargain. The dissent argues collection and enforcement expenses are distinguishable from negative equity because such expenses are transaction costs. Dissenting Op. at 1289. The term “transaction costs,” however, is entirely absent from the statute and the Official Comment. Had the drafters of the U.C.C. intended to limit a purchase-money security interest to cash price plus transaction costs, they could easily have done so. Instead, we are left with the language the drafters actually used, which we conclude is broad enough to encompass negative equity on trade-in vehicles.
The Fords also argue this result will enable predatory lending on the part of automobile dealers by encouraging them to refinance antecedent debt secured by a new vehicle. For reasons well articulated by the Fourth Circuit, this concern is overstated. See In re Price, 562 F.3d at 627. *1286 The reasons for treating the trade of an old vehicle for a newer one as a single transaction include the similarity in function between the new and old vehicles. The vehicle trade-in is a common, established transaction in the automobile industry, and it makes sense for many consumers to discard their old vehicles when they acquire new ones. The discharge of unrelated antecedent debt, however, may not bear the required “close nexus” to the acquisition of a new vehicle. Id.; Kan. Stat. Ann. § 84-9-103 cmt. 3. An automobile dealer who attempted to refinance unrelated antecedent debt and secure the new debt with the new car would present a question wholly different from the question presented here. See In re Vega, 344 B.R. 616, 617-18, 622 (Bankr.D.Kan.2006) (refusing to apply hanging paragraph to portion of car dealer’s loan used to extinguish debt on previous car loan when consumer did not trade in the old vehicle).
IV. Conclusion
Under Kansas law, Ford Motor Credit holds a purchase-money security interest in the entire amount owed to it by the Fords. The debt therefore falls within the ambit of the hanging paragraph of 11 U.S.C. § 1325, and the Fords may not bifurcate the debt for the purpose of a cramdown under 11 U.S.C. § 506(a). The interlocutory order of the Bankruptcy Court is therefore AFFIRMED and the case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

. The Kansas Bankers Association and the American Financial Services Association have filed briefs as amici curiae along with motions to participate as amici. The motions are hereby GRANTED.

. Although many courts have concluded, as this court does, that the issue is resolved by interpreting state law, the American Financial Services Association notes in its amicus brief that Article 9 of the U.C.C. has been adopted, at least in part, in every state. Therefore, although courts have been interpreting the *1283 laws of different states, they have been interpreting mostly identical statutory provisions.

. The Official Comment does not differentiate between "price” and "value given to enable” in explaining what constitutes a purchase-money obligation. See Kan. Stat. Ann. § 84-9-103 cmt. 3. In the U.C.C.'s pre-revision Article 9, the "price” prong explicitly referred to security interests held by the seller of the item, while the "value” prong referred to security interests held by any "person” who incurred an obligation enabling a buyer to acquire collateral. U.C.C. app. O § 9-107. Thus, the "value” prong allowed third parties to acquire purchase money security interests if they advanced money to enable the acquisition of consumer goods. Id. cmt. 2. Revised Article 9 has retained the "price” and "value” prongs in its definition of a purchase-money obligation, although neither the text nor the Official Comment mention the distinction between credit granted by sellers or third parties. See Kan. Stat. Ann. § 84-9-103(a)(2), cmt. 3. Because the Official Comment gives no indication that "price” and “value given to enable” have distinct meanings, see id. cmt. 3, this court interprets the statute such that, as in the pre-revision Article 9, the two terms are equivalent and refer respectively to obligations incurred by sellers and third parties.