REVISED Sept. 10, 2009

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2009

Charles R. Fulbruge III
Clerk

No. 08-20583

In The Matter Of: REBECCA ANN DALE also known as Becky Dale, also known as Dale Enterprises

Debtor

FORD MOTOR CREDIT COMPANY LLC

Appellee

v.

REBECCA ANN DALE

Appellant

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before JONES, Chief Judge, and PRADO and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

This appeal involves the proper construction of the "hanging paragraph"[1] in 11 U.S.C. § 1325(a), which was added to the Bankruptcy Code (Code) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Under the Code, a lien creditor generally holds a secured claim only to the extent

---

[1] The "hanging paragraph" derives its name from the fact that it is not numbered.

of the present value of the collateral that the lien encumbers. If the amount of the secured claim exceeds the present value of the collateral, the Code treats the excess amount as a separate, unsecured claim. This process is known as bifurcation or "stripping down" the secured claim to the value of the collateral. The hanging paragraph is an exception to this general rule, preventing bifurcation of a claim when the creditor has a "purchase-money security interest" (securing the claimed debt) in a motor vehicle acquired for the debtor's personal use within 910 days of the debtor's bankruptcy filing. The issue here is whether the purchase-money security interest exception contained in the hanging paragraph applies to those portions of a claim attributable to the pay-off of negative equity in a trade-in vehicle, gap insurance, and an extended warranty. The district court found that it does. We AFFIRM.

## I. FACTS

The facts of this case are undisputed. Debtor Rebecca Ann Dale purchased a 2006 Ford F150 pick-up truck from Gullo Ford Mercury of Conroe, Texas. The vehicle was for her personal use and had a cash price of $38,291.42. Ford Motor Credit Company, LLC (Ford) financed the sale under a retail sales contract (Sales Contract) and retained a security interest in the vehicle to secure the unpaid balance of the total sale price.

As part of the transaction, Dale traded in a 2003 Ford Expedition. That vehicle had a negative equity, with Dale owing $4,760 more on the vehicle than its then-market value.[2] As required by Texas law, Ford paid off this negative equity before accepting Dale's trade-in and included the sum in the new vehicle's total sale price.[3] The total sale price also included a gap insurance premium of

---

[2] Neither party suggests that the vehicle's negative equity was not a bona fide, reasonable amount.

[3] Under Texas law, it is a felony for a dealer to accept a trade-in without discharging the existing lien on the vehicle. TEX. PENAL CODE § 32.34.

$576.84; taxes not included in the cash price totaling $1,450.03; fees totaling $162.73; and an extended warranty charge of $3,030. Dale financed this entire amount totaling $48,271.02 through Ford at 0% interest.

Dale filed for bankruptcy less than one year later and submitted a Chapter 13 reorganization plan. Of the $41,834.94 still owed under the Sales Contract, Dale's Chapter 13 plan proposed to pay Ford $23,900 over 37 months at 10.25% interest. Under Dale's proposal, the remaining amount owed to Ford would be paid pro-rata with other unsecured claims. Ford objected to this plan and filed a proof of claim in the amount of $41,834.94, secured by the 2006 F150. The bankruptcy court declined to approve Dale's Chapter 13 plan and sustained Ford's objection in part. The court ruled that Ford's purchase-money security interest did not extend to those portions of the vehicle loan attributable to the pay-off of negative equity, the gap insurance premium, and the extended warranty charge. The court deemed these portions of the loan unsecured.

On appeal, the district court reversed. The court held that Ford had a purchase-money security interest in the entire Sales Contract, including those portions attributable to negative equity, gap insurance, and the extended warranty. Dale challenges that conclusion in this appeal.

## II. DISCUSSION

The proper scope of the hanging paragraph presents a legal question, which we review de novo. In re Sewell, 180 F.3d 707, 710 (5th Cir. 1999). We must decide whether the Code's hanging paragraph applies to the portion of a secured claim attributable to the pay-off of a trade-in vehicle's negative equity, gap insurance, and an extended warranty.

While bankruptcy courts across the country have divided on this issue, see In re Graupner, 537 F.3d 1295, 1300 (11th Cir. 2008) (collecting cases), three circuit courts and a state's highest court on certified question have recently weighed in on the debate, uniformly holding that the hanging paragraph

prevents bifurcation of vehicle loans, including those portions attributable to negative equity pay-off. See In re Price, 562 F.3d 618, 628 (4th Cir. 2009) (hanging paragraph prevents bifurcation of portions of claim attributable to negative equity and gap insurance); Graupner, 537 F.3d at 1301 (hanging paragraph prevents bifurcation of portions of claim attributable to negative equity); In re Ford, No. 08-3192, 2009 WL 2358365, at *4 (10th Cir. Aug. 3, 2009) (hanging paragraph prevents bifurcation of portions of claim attributable to negative equity); In re Peaslee, 13 N.Y.3d 75, slip op. at 5 (2009) (on certified question from the Second Circuit) (hanging paragraph prevents bifurcation of portions of claim attributable to negative equity).[4] We adopt this emerging majority position for the reasons explained below.

### 1. Statutory Scheme

The hanging paragraph was enacted as part of the BAPCPA. Prior to the enactment of the BAPCPA, the Code allowed a Chapter 13 debtor to modify the rights of a secured creditor with a purchase-money security interest in a vehicle by bifurcating the claim into secured and unsecured portions based on the vehicle's then-market value. 11 U.S.C. §§ 506(a)(1), 1325(a)(5). Section 506(a)(1) of the Code provides in relevant part:

> An allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

Under this provision, a creditor with a $15,000 claim secured by a vehicle with a present market value of $10,000 would have a secured claim of $10,000 and an unsecured claim of $5,000. Under a Chapter 13 plan, the $10,000 secured claim

---

[4] In light of the New York Court of Appeals' decision in *Peaslee*, Ford argues that the Second Circuit will join the Fourth, Tenth and Eleventh Circuits in holding that a creditor's purchase-money security interest encompasses the financing of negative equity, as well as the traditional transaction costs associated with purchasing a new vehicle.

would be paid in full with interest, while the $5,000 unsecured claim would be paid pro-rata with other unsecured claims. Use of § 506 in this manner is known as "bifurcation and cramdown" because the secured claim is reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim. See In re Wright, 492 F.3d 829, 830 (7th Cir. 2007) (discussing the effect of cramdown on the secured creditor's ability to recover the full value of its claim). Before the enactment of the BAPCPA, this cramdown provision had a pernicious effect on car dealers: it forced them to sustain a deficiency loss on the unsecured portion of the claim, while also forcing them to wait for payout on a now-reduced loan balance, with all the attendant risks of default that accompanied the original loan. In re Sanders, 377 B.R. 836, 844-45 (Bankr. W.D. Tex. 2007), rev'd, 403 B.R. 435 (W.D. Tex. 2009).

In apparent response to the undesirable effects of this cramdown on car dealers, Congress enacted the hanging paragraph as part of the BAPCPA. That provision eliminates bifurcation and cramdown in value if the vehicle was purchased within 910 days of the filing of the bankruptcy petition, and "if the creditor has a purchase-money security interest securing the debt that is the subject of the claim." As relevant here the provision reads:

> section 506 [allowing bifurcation and cramdown] shall not apply to a claim . . . if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor[.]

11 U.S.C. § 1325(a). Under the hanging paragraph, a creditor with a $15,000 claim secured by a vehicle with a present market value of $10,000 would avoid bifurcation and cramdown under § 506 and instead retain a secured claim in the entire purchase price of the vehicle.

2. Proper Scope of the Hanging Paragraph

In this case, it is undisputed that Dale incurred her debt within 910 days of filing for bankruptcy, that this debt was secured by a motor vehicle, and that Dale acquired this vehicle for her personal use. Thus, the sole issue is whether Ford has a "purchase-money security interest" securing that portion of the debt attributable to negative equity, gap insurance, and the extended warranty.

Ford urges, and the district court held, that the "plain and unambiguous" meaning of "purchase-money security interest" coupled with the hanging paragraph's pertinent legislative history is sufficient to resolve this issue. Statutory construction, of course, begins with the plain language of the statute. Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002). But the phrase "purchase-money security interest" does not have an ordinary or generally understood meaning; rather, it is a term of art. The phrase is used in only one other place in the Code, see 11 U.S.C. § 522(f), and the Code itself does not provide a definition. In short, the plain text of the hanging paragraph is insufficient to resolve this appeal.

Because the Code does not define "purchase-money security interest" and that term does not have a common ordinary meaning, we agree with the great majority of courts to address this issue that state UCC law must be used to define the hanging paragraph's phrase "purchase-money security interest." It is common in the bankruptcy context to look to state law to define security interests created under state law. "[W]hen determining the substance of property rights and security interests in bankruptcy, 'the basic federal rule is that state law governs.'" Price, 562 F.3d at 624 (quoting Butner v. United States, 440 U.S. 48, 57 (1979)); see also DaimlerChrysler Financial Svcs. Americas, LLC v. Miller, 570 F.3d 633, 640-41 (5th Cir. 2009)(applying state law to the question of surrendering the vehicle in full repayment of the debt). Further support for using state law comes from the only other section of the Code to use the phrase

"purchase-money security interest," § 522(f). Before enactment of the BAPCPA, courts had "uniformly" looked to state law to define the phrase "purchase-money security interest" as used in § 522(f). In re Billing, 838 F.2d 405, 406 (10th Cir. 1988). As the Second Circuit observed in the context of the hanging paragraph, "Congress, presumably aware that its prior use of this term of art had led courts to resort to state law . . . once again used this term of art without providing a federal definition or any interpretative guidance." In re Peaslee, 547 F.3d 177, 185 n.13 (2d Cir. 2008). Indeed, the four circuit courts to address this issue have all looked to state law to define "purchase-money security interest," with one certifying the issue to the relevant state high court. See id. at 179; Price, 562 F.3d at 621; Graupner, 537 F.3d at 1301; Ford, 2009 WL 2358365, at *3.

The parties agree that the relevant state law is that of Texas. In Texas, a "purchase-money security interest" in goods is defined as a security interest in goods that are "purchase-money collateral," and "purchase-money collateral" is in turn defined as goods that secure a "purchase-money obligation." TEX. BUS. & COM. CODE § 9.103. Texas defines "purchase-money obligation" as "an obligation . . . incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Id. The definition of "purchase-money obligation" thus contains two prongs: (i) the price of the collateral, and (ii) value given to enable the debtor to acquire rights in or use of the collateral.

Ford argues that it must show only that the debt at issue satisfies one of the prongs. In contrast, Dale argues that the relevant prong depends on whether the transaction at issue is one where the seller extends credit, or where the buyer obtains funds from a third-party lender. Because the transaction here falls into the former category, Dale argues that Ford can only prevail under the "price of the collateral" prong. Although support exists for Dale's position, see In re Penrod, 392 B.R. 835, 845 (B.A.P. 9th Cir. 2009) and In re Crawford, 397

7

B.R. 461, 464-65 (Bankr. E.D. Wis. 2008), Texas courts interpreting the definition of "purchase-money obligation" have not drawn a distinction between transactions where the seller extends credit and transactions where a third-party lender does so. Moreover, the three circuits and one state court on a certified question that have addressed this issue have all found that the creditor prevails if the debt at issue satisfies either prong. See Price, 562 F.3d at 625-26; Graupner, 537 F.3d at 1301-02; Ford, 2009 WL 2358365, at *3; Peaslee, 13 N.Y. 3d 75, slip op. at 4. We accordingly look to both prongs.

Official Comment 3 to the UCC elaborates on the scope of these prongs. That Comment provides:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

TEX. BUS. & COM. CODE § 9.103, Official Comment 3. As we have recognized, Official UCC Comments are "by far the most useful aids to interpretation and construction." Weathersby v. Gore, 556 F.2d 1247, 1256 (5th Cir. 1977) (citation omitted).[5]

Examining the language of the statute and the Comment, we conclude that "price" and "value given to enable" include certain expenses that might not otherwise come within the common understanding of "price," such as "freight charges," "demurrage," "administrative charges," "expenses of collection and enforcement," and "attorney's fees." See Price, 562 F.3d at 626 (making same

---

[5] In her reply brief, Dale relies in part on a prior official comment to former TEX. BUS. & COM. CODE § 9.107. This reliance is misplaced. If the drafters intended to retain the effect of the former comment, they would have said so. As both the section and comment were removed, we infer an intent to change the law or at least prevent reliance upon the comment.

observation); Graupner, 537 F.3d at 1302 ("To be sure, as one court has rightly observed, the fact that attorney's fees are listed in Comment 3 belies the notion that price or value is narrowly viewed as only those [traditional] expenses that must be paid to drive the car off the lot." (citation and quotation marks omitted)). Inclusion of these expenses dispels any notion that "price" and "value given" are limited to the price tag of the vehicle standing alone.

The Comment's language "and other similar obligations" demonstrates that the enumerated expenses are merely examples and do not constitute an exhaustive list of eligible expenses. Dale argues that the doctrine of ejusdem generis at least limits the types of expenses that fall within the scope of the Comment.[6] But the listed expenses in Comment 3 have no common feature beyond an attenuated connection to the acquisition or maintenance of the vehicle. The debt at issue in this case shares this connection and thus the doctrine of ejusdem generis does not further Dale's argument.

Third, the Comment includes "obligations for expenses incurred in connection with acquiring rights in the collateral" as a stand alone category of expense. This is evident by the fact that the Comment does not include language like "such as" or "including" between that phrase and the additional listed expenses. Negative equity financing, gap insurance, and extended warranties are properly considered expenses incurred by the creditor in connection with the buyer's goal of acquiring rights in the collateral. See Gen. Motors Acceptance Corp. v. Peaslee, 373 B.R. 252, 259 (W.D.N.Y. 2007) ("If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an

---

[6] The doctrine of ejusdem generis "counsels that general words following an enumeration of particular or specific items should be construed to fall into the same class as those items specifically named." Weisbart & Co. v. First Nat'l Bank of Dalhart, Tex., 568 F.2d 391, 395 n.6 (5th Cir. 1978).

integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could not be viewed as such an expense.").[7]

Fourth, negative equity and related expenses fit perfectly within the "value given to enable" prong of § 9.103. That prong states that a "purchase-money obligation" can consist of "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Dale asserts that there is a distinction between enabling a transaction to occur and enabling a debtor to acquire rights in the collateral, and that negative equity financing does only the former. See In re Sanders, 377 B.R. at 856. But as the Fourth Circuit recently noted, "[f]rom a practical perspective, that distinction is meaningless." Price, 562 F.3d at 625. "If negative equity financing enabled the transaction in which the new car was acquired, then, in reality, the negative equity financing also enabled the acquisition of rights in the new car." Id.

Dale also argues that negative equity is antecedent debt, and thus cannot be considered value given to enable. This is not so. Ford extended new credit to pay off the negative equity on the trade-in vehicle, which enabled Dale to purchase the new F150. The discharge of the amount owed on the old vehicle was directly related to Dale's acquisition of the new car. The funds used to pay off Dale's negative equity are thus properly considered "value given to enable."

Based on this analysis, we conclude that negative equity, gap insurance, and extended warranties constitute "purchase-money obligations" under Texas law, meaning Ford has a "purchase-money security interest" in the debt

---

[7] As mentioned above, this case was appealed to the Second Circuit. The Second Circuit did not rule on the issue but certified the question to the New York Court of Appeals. Peaslee, 547 F.3d at 186. The New York Court of Appeals concluded that negative equity is part of the purchase-money security interest. Peaslee, 13 N.Y.3d 75, slip op. at 5.

associated with those items.   As such, the Code's hanging paragraph operates to prevent bifurcation of this debt.[8]

## III.  CONCLUSION

For these reasons, the district court's judgment is AFFIRMED.

---

[8] Our conclusion is bolstered by general jurisprudential concerns with creating unnecessary circuit splits.  See Alfaro v. Comm'r of Internal Revenue, 349 F.3d 225, 229 (5th Cir. 2003) (noting that circuit splits are disfavored).