# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3866

_____

In re:  Dennis L. Mierkowski; Rebecca   *
J. Mierkowski,   *
  *
     Debtors.   *
----------------------   *
  *
Ford Motor Credit Company,   *
  *
     Appellant,   *
  *
     v.   *
  *
Dennis L. Mierkowski; Rebecca J.   *
Mierkowski,   *
  *   Appeal from the United States
     Appellees.   *   Bankruptcy Court for the Eastern
----------------------   *   District of Missouri.
  *
Missouri Bankers Association;   *
American Financial Services   *
Association,   *
  *
     Amici on behalf of Appellant,   *
  *
Jean Braucher; National Automobile   *
Dealers Association; Ingrid Hillinger;   *
Michael Hillinger; Adam J. Levitin;   *
National Association of Consumer   *
Bankruptcy Attorneys,   *
  *
     Amici on behalf of Appellees.   *

_____

Submitted: June 11, 2009
Filed: September 8, 2009
_____

Before BYE, HANSEN, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

Rebecca J. Mierkowski and Dennis L. Mierkowski filed a Chapter 13 petition under the Bankruptcy Code. In their plan, the Mierkowskis proposed to bifurcate Ford Motor Credit Company's claim. Ford Credit objected to the plan, and the bankruptcy court overruled the objection. Ford Credit appeals. Having jurisdiction under 28 U.S.C. § 158(d)(2), this court reverses and remands.

I.

In August 2006, the Mierkowskis purchased a new vehicle for the cash-sale price of $22,444. The Mierkowskis and the dealer agreed to a trade-in allowance of $13,750, but $21,820.65 was still owed on the trade-in vehicle. The difference between the amount still owed on a vehicle and its value is termed "negative equity." The negative equity in the trade-in, $8,070.65, was included in the "amount financed" (which equaled the "total sale price"). The transaction was memorialized by a Missouri Simple Interest Vehicle Retail Installment Contract, which provided for 0 percent interest and 72 monthly payments. The dealer assigned the contract to Ford Credit.

The Mierkowskis filed for Chapter 13 relief 682 days after purchasing the vehicle. In their plan, the Mierkowskis proposed to bifurcate Ford Credit's claim into two components: a secured component equal to the fair-market value of the new

vehicle, and an unsecured claim for the balance. Ford Credit objected, arguing its claim could not be bifurcated due to the "hanging paragraph" of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).[1] The bankruptcy court ruled that the debt attributable to the cash-sale price of the new vehicle was secured, but the debt attributable to the negative equity in the trade-in was unsecured.

## II.

Generally, a Chapter 13 debtor may retain a vehicle and modify the rights of a secured creditor that has a purchase-money security interest (PMSI) in the vehicle, by bifurcating the creditor's claim into secured and unsecured parts based on the vehicle's value. *See* **11 U.S.C. §§ 506(a)(1), 1325(a)(5)**. The creditor has a secured claim to the extent of the value of the vehicle, and an unsecured claim for the remainder of the debt. *See* **11 U.S.C. § 506(a)(1)**.

Under BAPCPA, the hanging paragraph prohibits bifurcation under § 506 if "the creditor has a purchase-money security interest securing the debt that is the subject of the claim," the debt was incurred within the 910 days preceding the filing of the petition, and the collateral is a motor vehicle for the debtor's personal use. At issue is whether Ford Credit has a PMSI securing its entire claim, including the amount financed to pay off the negative equity in the trade-in vehicle. This question of law is subject to de novo review. *See* ***Drewes v. Vote (In re Vote)***, 276 F.3d 1024, 1026 (8th Cir. 2002).

PMSI is not defined in the Bankruptcy Code. In BAPCPA, Congress incorporated the state-law definition of PMSI from Article 9 of the Uniform

---

[1] The "hanging paragraph" is the unnumbered paragraph directly following 11 U.S.C. § 1325(a)(9).

Commercial Code.  *See In re Price*, 562 F.3d 618, 624 (4th Cir. 2009); *Reiber v. GMAC, LLC (In re Peaslee)*, 547 F.3d 177, 184 (2d Cir. 2008).  Article 9 states:

> (a)  In this section:
>
>> (1)  "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
>>
>> (2)  "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
>
> (b) A security interest in goods is a purchase-money security interest:
>
>> (1) To the extent that the goods are purchase-money collateral with respect to that security interest;
>>
>> . . . .

**Mo. Rev. Stat. § 400.9-103**.  The Official Comment 3 to Article 9 states:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, dumurrage, administrative charges, expenses of collection and enforcement, attorney's fees, *and other similar obligations*.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. . . .

**Mo. Ann. Stat. § 9-103, Official Comment 3** (emphasis added). *See In re Nocita*, 914 S.W.2d 358, 359 (Mo. banc 1996) (When construing uniform and model acts enacted by the General Assembly, it is assumed the legislature enacted them with the intention of adopting the accompanying interpretations.).

Comment 3 lists a wide range of obligations that can be part of a vehicle's "price," indicating that "price" should be broadly interpreted. The Mierkowskis' negative-equity obligation is sufficiently similar to those listed in Comment 3, so as to be within the "other similar obligations" part of the definition of "price." *See Reiber v. GMAC, LLC (In re Peaslee)*, No. 109, 2009 WL 1766000, at *4 (N.Y. June 24, 2009). Since the parties here agreed to include the negative equity as part of the total sale price of the new vehicle, the negative equity was "an integral part of" and "inextricably intertwined" with the sales transaction. *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295, 1302 (11th Cir. 2008). The negative-equity financing of the trade-in and the new-car purchase were a "package deal." *Id.* Therefore, there was "a close nexus" between the acquisition of the new vehicle and the negative-equity financing. *See Price*, 562 F.3d at 627.

The amount financed to pay off the negative equity in the trade-in is "part of the price" of the new car, so it is a purchase-money obligation. *See* **Mo. Rev. Stat. § 400.9-103(a)(2)**. The new car is purchase-money collateral securing the purchase-money obligation. *See* **§ 400.9-103(a)(1)**. Thus, Ford Credit has a PMSI securing the negative-equity financing. *See* **§ 400.9-103(b)(1)**.

This interpretation is consistent with the Missouri Motor Vehicle Time Sales Act (MVTSA), Mo. Rev. Stat. §§ 365.010-365.160, which regulates installment sales of motor vehicles. Under Missouri law, courts take into consideration statutes involving similar or related subject matter to shed light upon the meaning of the statute at issue. *Lane v. Lensmeyer* 158 S.W.3d 218, 226 (Mo. banc 2005). Article 9 and MVTSA both relate to the installment financing of motor vehicles, and should be read *in pari materia*.

-5-

MVTSA defines "cash sale price" as the price at which the vehicle would have been sold for cash, instead of for installment payments. **Mo. Rev. Stat. § 365.020(1)**. It further defines "time sale price" as the cash-sale price plus insurance and other benefits, official fees, and interest. **§ 365.020(15)**. "Other benefits" includes negative equity payments, making negative-equity part of the time-sale price. *See* **§ 365.020(8), (15)**. "Price" under Article 9 includes interest, and thus, is not the cash-sale price. *See* **Mo. Ann. Stat. § 9-103, Official Comment 3**. Therefore, interpreting "price" in Article 9 to include negative equity is consistent with the definition of "time sale price" in MVTSA.

This court has considered the many opinions by bankruptcy courts addressing this issue. This court strives to "maintain uniformity in the law among the circuits, wherever reasoned analysis will allow." *Owens v. Miller (In re Miller)*, 276 F.3d 424, 429 (8th Cir. 2002). The Tenth, Fourth, and Eleventh circuits (the only three to resolve this issue) each determined that a creditor had a PMSI securing negative-equity financing for a trade-in vehicle. *See Ford v. Ford Motor Credit Corp. (In re Ford)*, ___ F.3d ___, No. 08-3192, 2009 WL 2358365, at *4 (10th Cir. Aug. 3, 2009); *Price*, 562 F.3d at 627; *Graupner*, 537 F.3d at 1302. This court holds that Ford Credit has a PMSI securing its entire claim.

III.

The judgment of the bankruptcy court is reversed, and the case remanded for proceedings consistent with this opinion.

BYE, Circuit Judge, dissenting.

Because I conclude negative equity is not "all or part of the price of" a new vehicle or "value given to enable the debtor to acquire rights in or the use of" a new vehicle, I respectfully dissent. Accordingly, I would hold Ford Motor Credit

Company's advance of credit in connection with the purchase of the Mierkowskis' motor vehicle was not entirely protected from "cramdown" by the "hanging paragraph" in 11 U.S.C. § 1325(a).

This case involves the interpretation and application of the "hanging paragraph" of § 1325(a)(9), which was added to the Bankruptcy Code (Code) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCP). See Pub. L. No. 109-8, 119 Stat. 23 (2005). The issue before the court is whether the anti-bifurcation provision in the hanging paragraph protects the negative equity in a trade-in vehicle against cramdown. I would hold it does not.

Bankruptcy rehabilitation under Chapter 13 commonly involves the adjustment of obligations owed to creditors holding liens on the bankruptcy debtor's property. Generally, lien creditors are deemed to hold a secured claim to the extent of the present value of the property the lien encumbers, while the excess, if any, is treated as a separate and unsecured claim. See 11 U.S.C. § 506(a)(1).

As the majority correctly notes, Congress amended 11 U.S.C. § 1325(a) when it passed the BAPCPA and added the hanging paragraph, which provides:

> For purposes of paragraph (5), section 506 [cramdown] shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-days preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*).

To fall within the hanging paragraph and be entitled to anti-bifurcation protection, four requirements must be satisfied: 1) the creditor must have a "purchase money security interest" (PMSI) in the collateral; 2) the debt must have been incurred within 910 days before the filing of the debtor's bankruptcy case; 3) the collateral for the debt must consist of a motor vehicle; and 4) the vehicle must have been acquired for the personal use of the debtor. Id. If these requirements are satisfied, the secured claim is fixed at the amount of the creditor's claim without resort to the cramdown provision mandated by § 506(a). This case involves the first requirement, i.e., whether Ford's extension of credit, which among other costs related to the transaction covered the negative equity in the debtor's trade-in vehicle, is fully protected or covered by a PMSI.

This issue has been confronted by dozens of lower courts, see Graupner v. Nuvell Credit Corp. (In re Graupner), 537 F.3d 1295, 1300 (11th Cir. 2008) (collecting cases), with the decisions generally taking one of two positions. The first holds the creditor's PMSI encompasses all components of the new vehicle purchase, including financing of negative equity. The Tenth, Fourth, and Eleventh Circuits have adopted this approach. See Ford v. Ford Motor Credit Corp. (In re Ford), No. 08-3192, 2009 WL 2358365, at *4 (10th Cir. Aug. 3, 2009); In re Price, 562 F.3d 618, 627 (4th Cir. 2009); In re Graupner, 537 F.3d at 1302. The second line of cases conclude certain components of the loan, most notably negative equity in a trade-in vehicle, are not purchase money and not secured by a PMSI.

A security interest in collateral is "purchase money" to the extent the collateral secures a debt for the money required to make the purchase. If an item of collateral secures some other type of debt, e.g., antecedent debt, it is not purchase money. For example, the debtor takes out a general purpose loan and pledges a vehicle he owns free of liens as security. The loan is secured but was not given to acquire the vehicle. Thus, the lender does not have a PMSI. Here, the question is whether negative equity

-8-

on a trade-in vehicle is "debt for the money required to make the purchase" of the new vehicle, or whether it is "antecedent debt."

The Code does not define PMSI so courts refer to state law to determine whether a creditor has a PMSI securing its claim. In re Weiser, 381 B.R. 263, 266 (Bankr. W.D. Mo. 2008). Section 9-103 of the Uniform Commercial Code (UCC), adopted by Mo. Rev. Stat. Ann. § 400.9-103(b)(1), provides a security interest in goods is a purchase-money security interest to the extent the goods are purchase-money collateral with respect to that security interest. It defines "purchase-money collateral" as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." Section 400.9-103(a)(1). The term "purchase-money obligation" is defined as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Section 400.9-103(a)(2). Thus, the focus of a PMSI under the UCC is on the "purchase-money obligation" secured by the collateral, which incorporates a two-part focus: 1) the price of the collateral; and 2) value given to enable the debtor to buy the collateral. Official Comment 3 to the UCC states:

> [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

U.C.C. § 9-103, Official Comment 3. The Mierkowskis argue negative equity is not equivalent to the various expenses listed in Comment 3. Conversely, Ford argues the list is not exhaustive. It contends the expenses identified in Comment 3 are merely examples of additional components of the "price" of the collateral or of "value given" to the debtor, and there is no reason why traditional or customary transaction costs

*and* the refinancing of negative equity in connection with the purchase of the new vehicle should not qualify as "expenses" within the meaning of the comment.

Comment 3 also provides that a PMSI "requires a close nexus between the acquisition of collateral and the secured obligation." Courts holding the negative equity part of the transaction is included within the PMSI conclude there is a "close nexus" between financing the negative equity in the trade-in vehicle and the purchase of the new vehicle. They hold the negative equity financing was part of the same transaction and may be properly regarded as a "package deal" because payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction. In other words, utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle. "The negative equity was an 'integral part of,' and 'inextricably intertwined with,' the sales transaction. To hold otherwise would not be a fair reading of the UCC." In re Graupner, 537 F.3d at 1302. As such, these courts focus on the transaction, and find the negative equity financing has a close nexus because, as a practical matter, without it the transaction would not have gone forward.

Additionally, these courts look to the legislative history of BAPCPA to find support for a broad reading of the hanging paragraph. They note the hanging paragraph ultimately seeks to require a debtor electing to retain a vehicle to pay the creditor the full amount of the claim and not an amount equal to its present value. See In re Trejos, 374 B.R. 210, 220 (9th Cir. BAP 2007) ("[T]he purpose underlying the 'Hanging Paragraph'" is to ensure debtors "'repay in a Chapter 13 the amount they actually agreed to pay for a motor vehicle purchased within 910 days of bankruptcy, instead of the true value of the collateral.'") (citation omitted). Additionally, rolling a trade-in's negative equity into the purchase price of a new vehicle was a common occurrence at the time BAPCPA was enacted in 2005. These courts conclude if Congress did not intend for the hanging paragraph to apply to a trade-in's negative equity, it would have the effect of excluding a substantial number of motor vehicle

finance transactions that were customary industry practice when BAPCPA was enacted.

Finally, these courts look to state statutes governing installment sales contracts regularly used in the sale of motor vehicles for additional support. In Missouri, motor vehicle installment contracts are regulated by the Missouri Motor Vehicle Time Sales Act (MVTSA), Mo. Rev. Stat. §§ 365.010-365.160. The MVTSA and other similar state statutes serve as consumer protection laws and require sellers and lenders to provide full disclosure of the costs associated with credit. They typically include definitions of "cash price" or "total sales price" which include negative equity. Lenders argue, and many courts have agreed, these statutes should be read in conjunction with Article 9 of the UCC under the doctrine of "in pari materia." These courts have concluded Article 9 and the acts governing installment contracts both cover the sales of motor vehicles, and the broader definitions of price in the installment acts to include negative equity should be applied to the term "price" found in Article 9's definition of purchase money.

Despite this contrary authority, I conclude negative equity is not secured by a PMSI in the purchase price of a motor vehicle. Our focus should be on the price and related costs directly associated with acquiring the vehicle, e.g., vehicle price, tax, license, etc., and negative equity is not part of the price or a cost directly related to purchasing a new vehicle or which *necessarily* arises when purchasing a new vehicle. A new vehicle may be purchased without financing negative equity but cannot be purchased without paying tax, title, license, etc. Admittedly, in today's market an agreement to finance negative equity is frequently part of the transaction, but our focus is on the "price" of the vehicle, not the transaction, i.e., what price or costs must be financed for the debtor to acquire the vehicle versus what price or costs must be financed to make the transaction happen. The fact that financing negative equity has become a customary industry practice, and practical reality necessary to many motor vehicle sales transactions, does not alter the fact that negative equity does not fall

-11-

within Article 9's definition of "price" or "value given." Money or value given to pay off the negative equity in a trade-in vehicle is not, in the strictest sense, given to acquire rights in the secured collateral. Neither does the negative equity represent any part of the price of the vehicle or associated costs arising directly from the sale. The realities of such transactions frequently require the financing of negative equity to facilitate the sale, but the focus should be on price or value given as defined by Article 9, and not what is necessary to entice sellers and lenders into the transaction. Negative equity is an antecedent unsecured debt and cannot be transformed into a purchase money obligation secured by a PMSI by rolling it into the loan used to finance the actual price and costs directly related to purchasing the vehicle. "[N]egative equity is not part of the PMSI [and] payment of old loans by the new lender is 'merely an accommodation which facilitates each transaction' rather than 'value given to enable the debtor to acquire rights in or the use of the collateral.'" In re Westfall, 365 F.R. 755, 760 (Bankr. N.D. Ohio 2007).

I also reject the majority's "close nexus" rationale. Article 9's definition of "purchase money obligation" intends a causal connection between the value given and the acquisition of rights to the collateral. If a creditor loans money to allow a consumer to purchase a vehicle, the value given must be used to acquire the vehicle, not to pay off existing debt. Value given to finance negative equity is not directly related to acquiring the collateral, even if without such financing the transaction would not come to fruition. The close association which financing negative equity has to many vehicle sales transactions is not enough to satisfy the close nexus test, because negative equity is not causally related to the price of the new vehicle. See In re Ford, 2009 WL 2358365, at *10 (Tymkovich, J., dissenting) ("The definition of PMSI . . . does not encompass any and every expense that might enable a particular purchaser to complete the purchase . . . .").

I further conclude the definition of "price" in the various states' motor vehicle installment sales acts should not be used to supplement Article 9's definitions of

-12-

purchase money obligation and PMSI. These installment sales acts are consumer protection statutes intended to require full disclosure to borrowers of the cost of credit – they do not define the parameters of secured transactions. The acts require sellers and lenders to advise borrowers when financing agreements include amounts attributable to negative equity. Therefore, the acts typically include negative equity within the definition of "price" or "total cost." Nowhere in the acts, however, are the terms "purchase money obligation" or "purchase money secured interest" discussed or defined. Because the statutes cover the disclosure of credit terms, and not secured transactions, they do not serve a similar purpose and the doctrine of in pari materia does not require they be read in concert.

Finally, the legislative history of the hanging paragraph does not expand its coverage to include negative equity financing within the definition of purchase money obligations secured by a PMSI. Lenders and proponents of a broader reading argue Congress intended to protect sellers of motor vehicles and lenders who finance such transactions from abusive cramdown practices. From this, they conclude Congress intended to protect sellers and lenders from cramdown in all instances. Those favoring a narrower reading argue the hanging paragraph must be read in conjunction with Article 9 and its definitions of purchase money obligations and PMSIs. They contend Congressional intent cannot expand those definitions beyond their traditional meanings. I agree. There may be a clear intent by Congress to offer greater protection to sellers and lenders holding PMSIs in vehicles, but the hanging paragraph does not change the traditional meanings of purchase money obligation and PMSI and expand them to include negative equity financing.

> Congress ultimately settled on protecting *only* purchase money security interests from cram down. This might have reflected a Congressional compromise to protect certain fees that are properly considered part of a purchase-money loan – i.e., fees akin to transaction costs – and not to protect negative equity. But we are not privy to Congress's internal

deliberations, and this is why we ordinarily must confine our inquiry to the language of statutes as enacted.

Id. at *13 (Tymkovich, J., dissenting) (emphasis in original) (internal citations omitted).

For these reasons, I would hold the negative equity is not a part of Ford's PMSI and not protected from cramdown under the hanging paragraph. Therefore, I respectfully dissent.

_____