In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3181

IN RE:

AUBREY HOWARD,

*Debtor-Appellant.*

AMERICREDIT FINANCIAL SERVICES,

*Creditor-Appellee.*

Appeal from the United States Bankruptcy Court
for the Northern District of Illinois, Eastern Division.
No. 08-B-32998—**Jacqueline P. Cox**, *Bankruptcy Judge*.

ARGUED JANUARY 12, 2010—DECIDED MARCH 1, 2010

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This direct appeal from the bankruptcy court, pursuant to 28 U.S.C. § 158(d)(2)(A), requires us to consider an issue that is new in this court. It is whether the bankruptcy court's "cramdown" power in a Chapter 13 bankruptcy (the counterpart, for an individual, to corporate reorganization in bankruptcy—Chapter 11) extends to an automobile dealer's, or

other creditor's, taking a security interest in a customer's "negative equity" in his traded-in vehicle. (Often as in this case the financing of the purchase of a car is done by a finance company rather than by the dealer who sells the car. So when we refer to the "creditor," it is to the finance company rather than to the dealer.)

The issue presented by the appeal requires some explaining, beginning with "cramdown," which means forcing a secured creditor to take cash in lieu of his collateral. The bankruptcy judge first determines the market value of the collateral. The creditor's claim is treated as a secured claim to the extent of that value. If the value is less than the unpaid balance of the secured loan, the difference is demoted to being an unsecured claim of the creditor. 11 U.S.C. § 506(a)(1). In a Chapter 13 bankruptcy, the debtor gets to keep the collateral over the objection of his creditor, provided that the plan requires him to make payments (for example, monthly) to the creditor equivalent to the market value of the collateral, as calculated by the court. 11 U.S.C. § 1325(a)(5)(B).

If the bankruptcy judge values the collateral accurately and the debtor makes the payments that the plan requires, the creditor is no worse off than he would be had he foreclosed his secured interest. But if the judge undervalues the collateral, the creditor is worse off, while if the judge overvalues it the debtor will surrender the collateral to the creditor (for if it is overvalued, this means that the monthly payments that the debtor is required to make to retain the collateral will exceed its value), who will not be able to sell it for more than the

market price. Bankruptcy judges sometimes misvalue collateral. If we assume that their errors are unbiased, in half the cases of misvaluation the creditor is made worse off by cramdown and in the other half he is made no better off, and thus he is systematically disadvantaged by the availability of cramdown. *In re Wright*, 492 F.3d 829, 830 (7th Cir. 2007). Heads he loses, tails he wins nothing.

The creditor is further disadvantaged because the debtor may default on his payment obligations, forcing the creditor to repossess the collateral at a time when it may have greatly depreciated in value. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962-63 (1997). It is only a small consolation to the creditor that he retains an unsecured claim to the difference between what he is owed and what he retains of his secured interest after cramdown, because unsecured claims in bankruptcy are usually worth little.

Both the asymmetric consequences of misvaluation by bankruptcy judges and the risk of second defaults (the debtor's defaulting on his payment obligations under the plan) operate to the special disadvantage of car dealers because cars depreciate in value so rapidly (often by as much as 20 percent in the first year), with the result that the effect of cramdown is to shrivel the dealer's (or, as in this case, a finance company's) secured interest.

In response to complaints from dealers and their financiers, Congress added (as part of the Bankruptcy Abuse Prevention and Consumer Protection Act) a paragraph at the end of 11 U.S.C. § 1325(a), which is the section that

authorizes cramdowns in Chapter 13 bankruptcies. The paragraph (confusingly referred to in the cases as the "hanging paragraph" because it doesn't have a sub-section designation) forbids the use of the cramdown power to reduce a purchase money security interest if the debt secured by that interest was incurred within 910 days before the declaration of bankruptcy and the security was a motor vehicle that had been acquired for the debtor's personal use. The worry behind the paragraph is that a car buyer who has financed his purchase will declare bankruptcy under Chapter 13 and propose, and obtain approval of, a plan that allows him to keep the car by paying the creditor, in installments, just its depreciated value as determined by the bankruptcy judge.

The debtor in this case bought a car from a dealer in Illinois (and so their contractual relation is governed by Illinois law). The purchase was financed by a purchase money security interest—and sure enough, within 910 days the debtor declared bankruptcy under Chapter 13.

The price of the car was $30,000 (we round off all figures to the nearest $500). The debtor made a cash down payment of $4,500 and in addition traded in his old car, which was valued in the contract of sale for the new car at $14,500. But he had not paid off the loan that had financed the purchase of that car; he still owed $22,500, making his equity in the old car a minus $8,000. In other words, he had "negative equity" in the old car. "Equity" is the difference between the value of a property and the debt on it, and if the debt is greater than that value the equity is a negative number.

The financing of the purchase of the new car included the $8,000. So instead of borrowing $25,500 (the purchase price of $30,000 minus the down payment of $4,500) to finance the purchase (plus $2,000 to cover taxes and fees, for a total of $27,500), the plaintiff borrowed $35,500: $27,500 plus the $8,000 in negative equity. The loan on the plaintiff's old car came due when it was sold, as a trade-in, to the new dealer, whose finance company discharged the lien on the trade-in by paying the old dealer (or its finance company) the $22,500 that the buyer owed on the old car.

The question is whether the $8,000 paid to cover the negative equity on the trade-in is subject to the bankruptcy judge's cramdown power. The plaintiff says it is because the car is the only thing (aside from some or all of the $2,000 in taxes and fees, as we'll see) in which a creditor has a purchase money security interest. The creditor claims it isn't because the purchase money security interest includes the negative equity. The bankruptcy judge sided with the creditor, ruling, in agreement with all the reported appellate decisions to date, see *In re Peaslee*, 585 F.3d 53, 57 (2d Cir. 2009) (per curiam); *In re Mierkowski*, 580 F.3d 740, 742-43 (8th Cir. 2009); *In re Dale*, 582 F.3d 568, 573-75 (5th Cir. 2009); *In re Ford*, 574 F.3d 1279, 1283-86 (10th Cir. 2009); *In re Price*, 562 F.3d 618, 624-29 (4th Cir. 2009); *In re Graupner*, 537 F.3d 1295, 1300-03 (11th Cir. 2008), that a purchase money security interest in a car includes negative equity.

The Bankruptcy Code does not define purchase money security interest, and generally and in the present

setting the rights enforced in bankruptcy are rights created by state law. *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 127 S. Ct. 1194, 1204-05 (2007); *Butner v. United States*, 440 U.S. 48, 54-57 (1979); *In re Wright, supra*, 492 F.3d at 832-33; *In re Carlson*, 263 F.3d 748, 750-51 (7th Cir. 2001); *In re Dale, supra*, 582 F.3d at 573; *In re Price, supra*, 562 F.3d at 624. So we go to Article 9 of the Uniform Commercial Code, in force in Illinois as in every state, 810 ILCS 5/9-101 *et seq.*, which defines security interests in personal property, including cars, and so is the natural place to look for the answer to our question. But the Code does not mention negative equity. It does, however, define a "purchase-money obligation": it is "an obligation . . . incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." UCC § 9-103(a)(2). The "value given" part of the definition is intended to make clear that the obligation can be to a finance company, as in this case, rather than to the seller.

A "purchase-money security interest" is a security interest in the item purchased. UCC §§ 9-103(a)(1), (b)(1). But it does not include just the price of the item, in this case the new car bought by the plaintiff. A comment to UCC § 9-103(a)(2) (comment 3) says that "the 'price' of the collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other

similar obligations . . . . [But] a security interest does not qualify as a purchase money-security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price." So if the purchaser's promissory note provides that in the event of default he shall owe, in addition to unpaid principal and accrued interest, an attorney's fee of 15 percent of the amount due, and he does default, the purchase money security interest includes the attorney's fee. At the other extreme, suppose the purchaser has unsecured credit card debt which he offers to roll over to the creditor who is financing his car purchase. The creditor pays off the debt, which the purchaser then owes the creditor. That additional debt would not be part of the purchase money security interest and so would be subject to the cramdown power of the bankruptcy court.

Where does negative equity fit in this spectrum?

The creditor emphasizes that Illinois like other states has a statute specifically regulating the sale of cars on credit. (These statutes have figured prominently in the reasoning of some of the courts that have held that negative equity can be part of a purchase money security interest.) The Illinois Motor Vehicle Retail Installment Sales Act provides that the "amount financed" by the dealer or the finance company includes not only the "cash sale price" but also "all other charges individually itemized, which are included in the amount financed, *including the amount actually paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security*

*interest*, lien interest, or lease interest *on the property traded in, but which are not part of the finance charge*, minus the amount of the buyer's down payment in money or goods." 815 ILCS 375/2.8. Another section defines "deferred payment price" as the "total of (1) the cash sale price . . ., (2) all other charges individually itemized which are included in the amount financed but which are not a part of the finance charge, and (3) the finance charge." 815 ILCS 375/2.10. The portion of the statute that we have italicized is an exact description of the transaction involving the negative equity in the plaintiff's trade-in. The creditor paid to discharge the security interest in the trade-in and included the payment in the credit extended to the plaintiff to enable him to buy the car. The negative equity was part of the "deferred payment price," just as if the dealer had charged $8,000 more for the car.

Article 9 of the UCC states that transactions governed by it are subject to statutes that establish "a different rule for consumers," UCC § 9-201, which in Illinois includes the Motor Vehicle Retail Installment Sales Act. 810 ILCS 5/9-201(b)(2). (We cite Illinois's version of the UCC here because it refers specifically to the Motor Vehicle Retail Installment Sales Act.) The Act, read literally, allows a car dealer or financier to include negative equity in the amount of the price of the car that he finances, just as he can include an attorney's fee. End of case? Probably not; probably the Act shouldn't be read literally as encompassing our case. It's a consumer-protection statute, intended to require disclosure of the charges that make up the total price that a consumer pays

for the car, rather than to prescribe what is and is not included in the purchase money security interest. But it is at least evidence that negative equity is indeed a common element of a credit purchase of a car, and this will turn out to be important in our analysis.

If we set the Motor Vehicle Retail Installment Sales Act to one side, we are left with the UCC comment that says that a purchase money security interest includes "obligations for expenses incurred in connection with acquiring rights in the collateral"—and that seems a pretty good description of negative equity. It is an obligation assumed by the buyer of the car in connection with his acquiring ownership.

But we should consider the effect on other creditors of including negative equity in the purchase money security interest. That security interest enjoys priority should the purchaser default, and is thus an exception to the general rule that existing secured debt has priority over new secured interests in the same goods. UCC § 9-324(a); 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 33-4, pp. 320-21 (6th ed. 2010). The concern behind the general rule is that new extensions of credit increase the risk of default on the old. See Hideki Kanda & Saul Levmore, "Explaining Creditor Priorities," 80 *Va. L. Rev.* 2103, 2111-14 (1994). The purchase money security interest is therefore limited, as the name implies, to newly purchased property, so that the effect on the debtor's existing secured creditors is limited even if their credit agreements with the debtor include "after-acquired property" clauses, which would

give them a security interest in the debtor's subsequently acquired property. *Salem National Bank v. Smith*, 890 F.2d 22 (7th Cir. 1989). Such clauses do not generally extend to consumer goods, UCC § 9-204(b)(1), but neither are purchase money security interests limited to such goods; and so the effect of such interests in the commercial as distinct from consumer context is relevant to understanding the concept of such a security interest and helps us see why such interests are given priority.

Even the debtor's unsecured creditors are harmed less by the priority of a purchase money security interest than they would be by the debtor's borrowing against his existing assets, because the debt created by the purchase money security interest is partially offset by the value of the property bought with it. This isn't true when the debtor, having acquired property with unsecured credit, grants the unsecured creditor a security interest in the property. The comment to UCC § 9-103 that we cited earlier is explicit that in such a case the new security interest does not qualify as a purchase money security interest. That is our example of the rollover of credit-card debt.

The difference between that example and this case is that wrapping negative equity into the purchase money security interest is often necessary to enable the purchase of the car, given the impediment to financing car purchases that Chapter 13's cramdown provision would otherwise create. That necessity—which is underscored by the fact that in almost 40 percent of all car sales the consideration includes a trade-in with negative equity, James A.

Wilson, Jr. & Sandra L. DiChiara, "The Changing Land-scape of Indirect Automobile Lending," 2 *FDIC Supervisory Insights* 29, 30 (Summer 2005), www.fdic.gov/regulations/ examinations/supervisory/insights/sisum05/si_ summer05.pdf (visited Feb. 7, 2010)—is the justification for allowing the creditor to enlarge his secured interest to the prejudice (though the prejudice is less than it would be were it not limited to a new asset of the debtor) of the debtor's other creditors. The enlargement eliminates the misvaluation problem because the entire car loan is secured. It also goes some distance toward solving the depreciation problem; given the plaintiff's modest down payment, had the creditor been forbidden to wrap the $8,000 in negative equity into its purchase money security interest, it would have had a secured interest of only $27,500 in a car worth $30,000 on the day of sale but probably no more than $24,000 a year later.

So on the one hand purchase money security interests, because they are limited to newly acquired assets of the debtor, need not be narrowly limited in order to protect creditors, and on the other hand allowing the purchase money security interest to include negative equity—a permission that does no violence to the language of Article 9, though neither is it compelled by it—may be essential to the flourishing of the important market that consists of the sale of cars on credit.

Of course the dealer or finance company can always tell a prospective buyer to go pay off the negative equity himself. At argument the plaintiff's lawyer gave us the hypothetical case of a shopper for a pricy BMW. Wealthy

people usually don't finance their purchase of a car, but if they do they can borrow from a bank, or dig into their savings for, the money needed to pay off any negative equity on their trade-in. But the automobile industry is understandably not content with selling cars only to wealthy people. And Article 9 does not seek to discourage credit transactions. We therefore join the other courts in ruling that negative equity can be part of a purchase money security interest and if thus secured is not subject to the cramdown power of the bankruptcy judge in a Chapter 13 bankruptcy. The decision of the bankruptcy court denying cramdown of a Chapter 13 plan that excludes negative equity from a purchase money security interest is therefore

AFFIRMED.