**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: MARLENE A. PENROD,
                        *Debtor,*

                                            No. 08-60037

AMERICREDIT FINANCIAL SERVICES,           BAP Nos.
INC.,                                       07-1360
                        *Appellant,*        07-1368

            v.                              ORDER

MARLENE A. PENROD,

                        *Appellee.*

Filed February 28, 2011

Before: Alfred T. Goodwin and William A. Fletcher,
Circuit Judges, and Richard Mills, Senior District Judge.*

Order;
Dissent by Judge Bea

---

## ORDER

Judge W. Fletcher has voted to deny the petition for rehearing en banc, and Judges Goodwin and Mills so recommend.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R. App. P. 35(f).

---

*The Honorable Richard Mills, Senior District Judge for the U.S. District Court for Central Illinois, Springfield, sitting by designation.

Appellant's petition for rehearing en banc, filed August 30, 2010, is DENIED.

---

BEA, Circuit Judge, joined by O'SCANNLAIN, TALLMAN, and CALLAHAN, Circuit Judges, dissenting from the denial of rehearing en banc:

The panel reads Congress's revisions to the Bankruptcy Code to mean the exact opposite of what the plain language says. *In re Penrod*, 611 F.3d 1158, 1159 (9th Cir. 2010).[1] In doing so, the panel renders the relevant statute, 11 U.S.C. § 1325(a)(*), completely meaningless. In contrast, each of the other eight circuits[2] to address this statute have been unwilling to re-write its plain language, and have instead enforced it. Further, by ignoring how automobiles are actually financed, the panel's revision leaves an already struggling auto industry in perilous waters and affects thousands of commercial transactions each year. Thus finding ourselves on the wrong end of an eight to one circuit split, we respectfully dissent from the denial of rehearing en banc.

## I.

This is an appeal from a decision by the Bankruptcy Appellate Panel ("BAP"), affirming a decision by the bankruptcy court confirming Marlene Penrod's Chapter 13 Plan. Penrod's reorganization plan listed a debt for a loan made to her for the purchase of a new Ford Taurus automobile. Although the

---

[1] The panel remanded the case to the BAP only for a recalculation of figures that are disputed, but unrelated to the reasons for my dissent.

[2] *See, e.g.*, *In re Westfall*, 599 F.3d 498 (6th Cir. 2010); *In re Howard*, 597 F.3d 852 (7th Cir. 2010); *In re Peaslee*, 585 F.3d 53 (2d Cir. 2009) (per curiam); *In re Dale*, 582 F.3d 568 (5th Cir. 2009); *In re Mierkowski*, 580 F.3d 740 (8th Cir. 2009); *In re Ford*, 574 F.3d 1279 (10th Cir. 2009); *In re Price*, 562 F.3d 618 (4th Cir. 2009); *In re Graupner*, 537 F.3d 1295 (11th Cir. 2008).

entire loan was secured by the Taurus, she sought to use 11 U.S.C. § 506 of the Bankruptcy Code to convert this loan into a "secured" portion (for the value of the Taurus) and an "unsecured" portion reflecting the amount that the dealer had paid a bank to discharge the unpaid balance of her loan on her trade-in car, a Ford Explorer. Penrod owed more on the Explorer than its agreed trade-in value, and this difference is known in the auto trade as "negative equity." The bankruptcy court ruled that the negative equity portion of the loan could be treated as unsecured debt. The BAP affirmed this ruling, and the three-judge panel affirmed the BAP.

## II.

Like millions of car purchasers every year, Marlene Penrod went into a dealership with an old car, a 1999 Ford Explorer, wanting to purchase a new car, a 2005 Ford Taurus. She held only registered, not legal, title to the Explorer. Her lender for the Explorer held legal title until she paid off the remainder of the loan. To get legal title to her Explorer, which she needed to trade it in for the Taurus, Penrod needed the entire debt on the Explorer paid off.

Now place yourself in the shoes of the Taurus dealer. From the dealer's perspective, the total purchase price of the new Taurus must include both the price for the Taurus, and the total amount of negative equity paid off by him to discharge Penrod's debt on her old Explorer. Now ask yourself the critical question, a question which the panel apparently failed to consider: Would anyone extend this line of credit and pay off the buyer's negative equity in her old car if he could not get a purchase money security interest ("PMSI")[3] in the total amount of debt he assumed? Not if he wanted to stay in business.

---

[3]A PMSI is a secured debt not subject to discharge in bankruptcy along with debts held by general creditors, secured by title to the car so that the holder of the secured interest—here, AmeriCredit—has the right to repossess the new car if the new owner fails to make a payment.

The specifics of this case make this point abundantly clear.[4] The liability Penrod agreed to assume was as follows:

| | |
|---|---:|
| The cost of new Taurus | $25,600 |
| Plus the cost of having the Explorer loan paid off | + $13,000 |
| Less the value of the Explorer | -$ 6,000 |
| Less Penrod's downpayment | -$ 1,000 |
| Total Penrod borrows secured by the new Taurus = | $31,600 |

As one can see, the amount of money the dealer paid the bank is every bit as much a part of the dealer's cost to sell the Taurus as is the factory invoice. It is part of the "purchase money loan" because the loan to pay off the balance owed on the Explorer is part of the purchase of the Taurus.

Before Penrod filed for bankruptcy, AmeriCredit had a secured loan for the entire balance left on the $31,600 loan for the Taurus. Had Penrod failed to pay any part of this loan, AmeriCredit was entitled to repossess the Taurus, a quick and effective method to persuade Penrod to keep up on her payments. However, after the bankruptcy court's ruling, AmeriCredit had only a partially secured loan, and a partially unsecured loan. All Penrod had to pay off was the balance on the $25,600 and she could fend off repossession of the car. She could fail to pay the balance of the $6,000 in negative equity and AmeriCredit would have no right to repossess the Taurus. It would have to line up with the unsecured creditors in bankruptcy. So this $6,000, that was once secured by the Explorer, and then by the Taurus, was converted into an unsecured debt in the class with general unsecured debtors—

---

[4]I use the figures from the panel's opinion. They have been rounded for ease of reference.

something neither the bank nor the dealer would ever have agreed to.

The distinction made by the panel opinion between the loan paid off and the new loan is artificial at best. *In re Penrod*, 611 F.3d at 1162. Is there any doubt that the loan company which held title to the old Explorer had a purchase money secured interest? No. Then why should the fact that the old loan is rolled into a new one in the purchase of the Taurus make a difference? It shouldn't.

Neither loan would ever have been made by the car companies absent a secured interest. The debtor should not be able to turn a secured loan into an unsecured loan just by deciding to buy a newer car. This change is a complete reversal of the rules by which thousands of loans have been made in one of this country's largest industries. In this economy, such a ruling hardly helps the already struggling car industry. As the panel recognized, approximately one-third of the car sales in America involve a trade-in vehicle with a negative equity balance. *In re Penrod*, 611 F.3d at 1162 (citing *In re Howard*, 597 F.3d 852, 857-58 (7th Cir. 2010)). According to the U.S. Department of Transportation, automobile sales in the U.S. from 1998 to 2008 have ranged from 6.8 to 8.1 million cars each year.[5] So the panel's opinion could easily affect thousands of transactions each year. This prospect is not simply an ancillary consideration, it is a practical reality that was well-understood by Congress and was the cornerstone of the analysis Congress set forth for us to follow.

### III.

Before the amendment of the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act

---

[5]*See* Bureau of Transp. Statistics, U.S. Dep't of Transp., National Transportation Statistics 1-12 (2010), *available at* http://www.bts.gov/publications/national_transportation_statistics/html/table_01_12.html

of 2005 ("BAPCPA"), one of the benefits of filing a Chapter 13 bankruptcy was that under § 506(a) the debtor could bifurcate a secured, unavoidable debt, with one part representing the amount of the value of the collateral, and the deficiency being treated as an unsecured claim. But then came § 1325(a)(*). After is was enacted, all this changed.

In 2005, as part of the Bankruptcy Code reform, Congress changed the rules about bifurcating loans into secured and unsecured claims:

> For purposes of paragraph (5) [secured claims], section 506 [which limits the amount of a secured claim to the value of the collateral securing the claim, in this case the value of the Taurus] *shall not apply* to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition [Penrod bought the Taurus 523 days before she filed for bankruptcy], and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor [everyone agrees the Taurus was for Penrod's personal use]. . . .

11 U.S.C. § 1325(a)(*) (emphasis added). In other words, this statute provides that AmeriCredit's secured claim is not limited to the value of the Taurus, but rather extends to the whole value of the loan made to effect the purchase of the Taurus, if AmeriCredit has a PMSI.

Keeping the entire loan, including negative equity, as a secured debt appears to be exactly what Congress intended. 11 U.S.C. § 1325(a)(*) was added as part of BAPCPA. *See* Pub. L. 109-8, § 306(b), 119 Stat. 80 (2005). The title of this section is Giving Secured Creditors Fair Treatment in Chapter 13, and this section specifies its purpose as "Restoring the

Foundation for Secured Credit." The plain language of the statute clearly says that "Section 506 shall not apply" in to these loans. 11 U.S.C. § 1325(a)(*). Section 506 is the only provision that allowed Penrod to bifurcate her loan in the first place. The panel's holding not only disregards the plain language of the statute, it also undermines this purpose.

The panel says that § 1325(a)(*) does not apply because AmeriCredit did not have a PMSI in the negative equity it paid off so Penrod could use the Explorer as a trade-in for the Taurus. Under Bankruptcy law, what constitutes a PMSI—as with other types of property interests—is usually determined by state law. *See Butner v. United States*, 440 U.S. 48, 54-57 (1979). California, where the parties reside and this transaction took place, has adopted the relevant portion of Revised Article 9 of the Uniform Commercial Code ("U.C.C.") and the U.C.C. Official Comments. This is particularly useful because the other circuits to address this issue have also involved transactions in states that had adopted Article 9 of the U.C.C.

A PMSI is defined in California Commercial Code § 9103 as, *inter alia*:

> 'Purchase money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or *for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used*.

Cal. Comm. Code § 9103(a)(2) (emphasis added). That is exactly what we have here. Penrod gave the dealer an obligation (the loan of $31,600, not just $25,600) incurred as part of the price of the collateral (the $25,600 for the Taurus) and for the value given ($6,000 in negative equity) to enable Penrod to obtain the Taurus.

The panel concentrates solely, and mistakenly, on the first part of California Commercial Code § 9103(a)(2) in attempt-

ing to determine the "price" of the collateral. *In re Penrod*, 611 F.3d at 1162. What the panel overlooks is the *second* clause of California Commercial Code § 9103(a)(2); that clause defines a "purchase money obligation" as the "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Paying off the old loan on the Explorer was the value given to enable Penrod to acquire the new Taurus. The panel renders this section, relied upon by every other circuit to look at the issue, superfluous. The panel says the second clause of the statute does not apply but fails to explain why. *See In re Penrod*, 611 F.3d at 1164.

The statute—as read by all other eight circuits—requires only that the value given "enable" the actual purchase. Thus the issue is not whether Penrod *could* have purchased the Taurus without trading in the Explorer, but rather what she in fact *did*.[6] It is undisputed that she used her ownership interest in the Explorer "to enable [her] to acquire rights in or the use of the [Taurus]" and that the value given was in fact so used. Cal. Comm. Code § 9-103 (a)(2). If the transfer of title of the

---

[6]Perhaps Penrod did not need to trade in her Explorer to afford the Taurus, but she chose to do so. She also chose to sign the new loan agreement that clearly stated the entire loan was secured by the Taurus:

**Security Interest**

You give us a security interest in:

> The vehicle and all parts or goods installed in it;

> All money or goods received (proceeds) for the vehicle;

> All insurance, maintenance, service or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts;

> *This secures payment of all you owe on this contract.* It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.

Explorer to the Taurus dealer did not "enable" the sale of the Taurus to Penrod, then words have lost their meaning.[7]

## IV.

Every other circuit court to address this precise issue has upheld Congress's clear intent and granted creditors a PMSI in the entire debt incurred in financing a vehicle purchase, including the purchaser's negative equity. In doing so, each of these circuits was interpreting a state's law which had adopted the language of U.C.C. Article 9-103 unchanged, as did California Commercial Code § 9103. *See In re Howard*, 597 F.3d at 855.

One of the early courts to evaluate a claim similar to Penrod's in depth was a South Carolina bankruptcy court. The court had before it a Chapter 13 plan in which the debtors proposed to bifurcate a loan on their vehicle into a secured portion of the debt (representing the value of their new car), and an unsecured portion for the balance (representing the negative equity of their trade-in). *In re Vinson*, 391 B.R. 754 (Bankr. D.S.C. 2008). The loan on the vehicle included negative equity, as well as title and document fees. The bankruptcy court looked to South Carolina law for the statutory definition of a purchase money loan as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." S.C. Code Ann. § 36-9-103(a)(2).[8] The court examined the official commentary to

---

[7]"Enable" is defined as: "1. to make able; give power, means, competence, or ability to; authorize: This document will enable him to pass through the enemy lines unmolested. 2. to make possible or easy: Aeronautics enables us to overcome great distances. 3. to make ready; equip (often used in combination): Web-enabled cell phones." *See http://dictionary.reference.com/browse/enable* (last visited January 20, 2011).

[8]Note that each state's version of U.C.C. § 9-103, including S.C. Code Ann. § 36-9-103(a)(2), is identical to California Commercial Code § 9103.

this statutory provision and noted that "purchase money" included negative equity and the other charges included in the financing. 391 B.R. at 757-58. Therefore, the court had no difficulty holding that the negative equity was part of the PMSI; thus it denied confirmation of the debtors' bifurcation plan.

The Fifth Circuit agreed, holding that under Texas' version of the U.C.C., negative equity, gap insurance, and extended warranties were all purchase-money obligations. *In re Dale*, 582 F.3d 568 (5th Cir. 2009). The court held that the creditor from which the Chapter 13 debtor had bought a pick-up truck (a frequent occurrence in Texas) has a PMSI in the debt derived from those items, and therefore the debtor could not bifurcate the claim into secured and unsecured portions.

In *In re Graupner*, 537 F.3d 1295 (11th Cir. 2008), the Eleventh Circuit agreed, applying Georgia's version of Article 9 of the U.C.C. *See* Ga. Code Ann. § 11-9-103. As with other states, Georgia defines a PMSI as a security interest to the extent that an obligation was incurred as all or part of the price of the collateral "or for value given to enable the debtor to acquire rights in the collateral." *Id.* at 1299. To determine whether negative equity was part of the "price" of the collateral or the "value given to enable" the transaction, the Eleventh Circuit applied the doctrine of *in pari materia*.[9] It relied on a Georgia consumer protection and disclosure statute covering the same subject matter, which defined "cash sale price"

---

[9]Unlike Georgia, we do not need to look to other state statutes to interpret the term "price" because California Commercial Code § 9103 specifically says that a " 'Purchase money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or *for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used*." Nevertheless, were we to employ the tool of *in pari materia*, we would still be compelled to find that negative equity is included in the term price, as did the other circuits. The California Automobile Sales Finance Act ("ASFA") includes "negative equity" charges in the "cash price" of the vehicle. Cal. Civ. Code § 2981(e).

as "any amount paid to the buyer to satisfy a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle." *Id.* at 1299 (internal quotations and citations omitted). The court concluded that "[n]egative equity was an integral part of and inextricably intertwined with the sales transaction." *Id.* at 1302.

Finally, the Eleventh Circuit also concluded that this interpretation was consistent with the legislative intent of § 1325(a)(*). This paragraph was added in 2005 at a time when bankruptcy courts commonly bifurcated interests in motor vehicles and limited the creditors' secured interest to the value of the motor vehicle at the time of the bankruptcy filing. *Id.* at 1297. The amendment was intended to end this practice. *Id.* at 1302. "The purpose underlying the hanging paragraph [§ 1325(a)(*)] is to ensure that debtors repay the amount they actually agreed to pay for a motor vehicle purchased within 910 days of bankruptcy, instead of the true value of the collateral." *Id.* (citations omitted). To interpret § 1325(a)(*) as excluding negative equity would render the amendment meaningless. *Id.* Therefore, the Eleventh Circuit held the creditor had a security interest in the entire amount of the loan, including that part of the loan accounting for negative equity.

The Second, Fourth, Sixth, Seventh, Eighth, and Tenth Circuits all agreed with the Fifth and Eleventh Circuits, and held that a creditor's PMSI applied to the entire debt incurred in financing a vehicle purchase, including those portions of the debt associated with the financing of the debtors' negative equity in a trade-in vehicle. *See, e.g.*, *In re Westfall*, 599 F.3d 498 (6th Cir. 2010) (interpreting Ohio's version of U.C.C. Article 9-103); *In re Howard*, 597 F.3d 852 (7th Cir. 2010) (Illinois); *In re Peaslee*, 585 F.3d 53 (2d Cir. 2009) (per curiam) (New York); *In re Mierkowski*, 580 F.3d 740 (8th Cir. 2009) (Missouri); *In re Ford*, 574 F.3d 1279 (10th Cir. 2009) (Kansas); *In re Price*, 562 F.3d 618 (4th Cir. 2009) (North Carolina). Each of these cases looked to state law that

tracked language identical to California Commercial Code § 9103.

## V.

Not only does the panel's construction of § 1325(a)(*) make no commercial sense, but it makes that section superfluous. Before BAPCPA, Debtors had the ability to bifurcate debts under § 506 into that covered by the collateral (the new car) which was secured, and any excess amount, which would not be considered a secured debt. Section 1325(a)(*) specifically states that in the case of the purchase of a new car, the ability to bifurcate debt secured by a new car "shall not apply." Yet that is exactly what the panel's opinion does.

We thus dissent from the denial of rehearing en banc, which could have prevented us from being on the wrong end of an eight to one circuit split.